**HOME HEALTH CARE, INC.,**
**Appellant/Cross-Appellee,**

v.

**Margaret HECKLER, Secretary of Health & Human Services,**
**Appellee/Cross Appellant.**

Nos. 82–2060, 82–2129.

United States Court of Appeals, District of Columbia Circuit.

Argued May 27, 1983.

Decided Aug. 30, 1983.

Charles B. Wayne, with whom Jerome Nelson, Washington, D.C., was on brief, for Home Health Care, Inc.

Sarah Willis Wilcox, Senior Coordinating Atty., Dept. of Health & Human Services, Washington, D.C., of the bar of the D.C. Court of Appeals, pro hac vice, by special leave of court, with whom Juan A. Del

Real, Gen. Counsel, Dept. of Health & Human Services, Washington, D.C., was on brief, for Secretary of Health & Human Services.

Before TAMM and SCALIA, Circuit Judges, and CHARLES R. RICHEY,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

The Secretary of Health and Human Services found Home Health Care's (HHC) leased car costs in providing Medicare services excessive and denied HHC full reimbursement. The district court held that this disallowance interfered with the provision of medical services in violation of 42 U.S.C. § 1395. We reverse the district court's holding and remand the case with the instruction that the court is to remand to the Provider Reimbursement Review Board so that the Secretary and her agents can evaluate the leased car costs in accordance with the regulations, which they have thus far failed to do.

## I. BACKGROUND AND FACTS

The Secretary of Health and Human Services is ultimately responsible for administering Federal Health Insurance for the Aged and Disabled, 42 U.S.C. §§ 1395 et seq. (1976 & Supp. V 1981) ("Medicare"). Day-to-day administration of the program, however, is conducted by fiscal intermediaries, which typically are insurance companies. The intermediaries enter into contracts with the Secretary and serve as her agents in disbursing funds and auditing the use of funds. The intermediaries are authorized to reimburse qualified providers for the reasonable cost of the services they render to Medicare beneficiaries. *Id.* § 1395f(b).

HHC participates in the Medicare program as a "provider of services" and is a "home health agency." *See id.* § 1395x(o), (u). Its employees visit approximately sixty home-bound patients in Florida each day to provide them with nursing care, physical therapy, and other services. In 1977 HHC decided to employ leased cars to meet part of its transportation needs rather than to rely solely on reimbursing employees on a mileage basis for the use of their personal cars. HHC concluded that the use of leased cars was necessary because of the difficulty of recruiting nurses who are willing to supply their own cars and because of the more reliable service offered by the leased cars, which are better maintained and for which replacements are provided by the leasing company if the cars become disabled. In fiscal 1978 HHC's leased car expense was $17,720, and the cost per mile was 40.7 cents.[1] In fiscal 1979 the leased car expense was $23,268, and the cost per mile was 56.6 cents.[2]

In reviewing HHC's 1978 cost report, Aetna Life & Casualty, Inc., the intermediary responsible for auditing HHC, found the leased car costs to be high and began an audit of the claim. It compared HHC's cost per mile figure to the fifteen-cent rate at which HHC reimbursed its employees for use of their personal cars,[3] to the Internal Revenue Service guidelines on car costs,[4] to the car cost figures determined by an American Automobile Association (AAA) study published in a Fort Lauderdale newspaper,[5] and to the informal standard of reasonableness that it had developed by reviewing the transportation expenses of other providers.[6] Aetna also compared the

---

\* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. *Home Health Care, Inc. v. Schweiker,* 542 F.Supp. 1378, 1379 (D.D.C.1982).

2. *Id.*

3. Letter from Aetna to Philip D. Green, Attorney for HHC, at 2, Joint Appendix (J.A.) at 35.

4. Deposition of Rolando Rios, Manager of Aetna's Florida Provider Audit and Reimbursement Program, at 31 (Oct. 16, 1980), J.A. at 82.

5. *Id.* at 32, J.A. at 83.

6. *Id.* at 31, 6, J.A. at 82, 93.

number of cars HHC leased, which ranged from four to seven, to the informal standard of reasonableness that it had developed by reviewing other agencies' leasing practices, and determined that HHC had leased too many cars.[7] Aetna decided that HHC's leased car costs were excessive and that HHC should be reimbursed only at a reasonable level. Relying on the AAA report on average car costs,[8] Aetna permitted recovery of only 19.6 cents per mile and thereby disallowed $10,119 of 1978 leased car expenses.

Because HHC learned of the disallowance after the beginning of fiscal 1979, it also leased cars for part of that year.[9] In reviewing HHC's 1979 cost report, Aetna again found the leased car expenses unreasonable. It permitted recovery of only 21.5 cents per mile and thereby disallowed $15,693 of 1979 leased car expenses.

After Aetna decided to disallow the leased car costs but before the Provider Reimbursement Review Board's hearing, Aetna collected leased car data from approximately thirty home health agencies operating in urban areas in Florida. The data indicated that fifty-eight percent of the providers used leased cars, that the average car was driven more than 20,000 miles per year, and that the average cost per mile was 19.89 cents in 1978 and 16.25 cents in 1979.[10] In contrast, HHC averaged about 8400 miles per car and 40.7 cents per mile in 1978, and 9200 miles per car and 56.6 cents per mile in 1979.

In April 1979 HHC appealed the disallowance of the 1978 car expenses to the Provider Reimbursement Review Board, and in June 1980 it appealed the disallowance of the 1979 expenses. *See* 42 U.S.C. § 1395oo (a), (h) (1976). The 1978 and 1979 disallowances were consolidated for hearing, and on February 9, 1981, the Board heard the case.

Finding that the AAA study and the subsequent survey showed that HHC's auto costs were excessive, that allowing 19.6 and 21.5 cents per mile was reasonable, and that Aetna had complied with the regulations, the Board affirmed the adjustment to the leased car costs. The Secretary's delegate declined to reverse, affirm, or modify the Board's decision, and the decision therefore became final. *See id.* § 1395oo(f)(1) (Supp. V 1981).

On appeal, the district court found that the Secretary had in effect forbidden HHC from using leased cars and that, consequently, she had controlled the provision of medical services. The court therefore held that the Secretary had violated section 1395, which prohibits federal interference with the practice of medicine, to the extent the cars were used for home visits as opposed to administrative purposes. Because home visits accounted for fifty percent of the leased car use, the district court upheld only one half of the Secretary's disallowance. The court also held that although Aetna had violated the regulations that instruct intermediaries to identify comparable providers and to compare their costs to those of the provider who is being audited, the subsequent survey provided a reasonable guide for evaluating HHC's leasing costs. The Secretary appealed the portion of the district court's order overturning one half of the disallowance, and HHC cross-appealed.

## II. DISCUSSION

A. *Interference with the Practice of Medicine*

Section 1395 provides:

PROHIBITION AGAINST ANY FEDERAL INTERFERENCE

Nothing in this subchapter shall be construed to authorize any Federal officer or

---

**7.** *Id.* at 30, J.A. at 81; *Testimony of Rolando Rios before the Provider Reimbursement Review Board*, at 92 (Feb. 9, 1981), J.A. at 184.

**8.** Deposition of Rolando Rios, at 32, J.A. at 83.

**9.** Testimony of Deborah Schwartz, Administrator of HHC, before the Provider Reimburse-

ment Review Board, at 23 (Feb. 9, 1981), J.A. at 136.

**10.** *Home Health Care, Inc.,* 542 F.Supp. at 1381; Position Paper of Aetna submitted to Provider Reimbursement Review Board, at 2 (Jan. 9, 1981), J.A. at 110–11.

employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

42 U.S.C. § 1395 (1976). The district court held that the Secretary violated section 1395 by in effect prohibiting the use of leased cars. On the other hand, section 1395f(b)(1) limits reimbursement to the "reasonable cost" of services provided, and section 1395x(v)(1)(A) defines "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." *Id.* § 1395f(b)(1) (Supp. V 1981); *id.* § 1395x(v)(1)(A) (1976). The Secretary argues that she merely limited HHC's leased car expense to a reasonable level as section 1395f(b)(1) requires.

Reading either section 1395 or section 1395f(b)(1) very broadly would render the other section meaningless. An extreme application of section 1395f(b)(1) would dictate a provider's every move in the name of reasonable cost. An extreme application of section 1395 would find the use of chauffeur-driven limousines or helicopters within the discretion of providers. These statutes, of course, must be read together "to produce a symmetrical whole," *Federal Power Commission v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498, 514, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499 (1949), which the courts have done.

In *American Medical Association v. Mathews*, 429 F.Supp. 1179 (N.D.Ill.1977), the court upheld regulations that limit reimbursement for drugs unless the doctor certifies that the more expensive drug is medically necessary. The court stated:

Congress made it clear in 1972 that it did not view certain cost limitation mechanisms as within the ambit of § 1395. By enacting a strengthened cost limita-

tion section (§ 1395x(v)(1)(A)) and authorizing the Secretary to exercise extensive cost control powers, Congress struck a balance between cost controls and professional independence. This balance is not upset by the incidental effects predicted by plaintiffs. The legislative history of § 1395x(v)(1)(A) demonstrates that Congress wanted the judgmental process in the health care delivery system to be influenced and animated by a consciousness of the costs of medical care:

Health care institutions, like other entities in our economy should be encouraged to perform efficiently and when they fail to do so should expect to suffer the ... consequences.... The committee believes that [these] objectives can only be accomplished by reimbursement mechanisms that limit reimbursement to the costs that would be incurred by a reasonably prudent and cost-conscious management. S.Rep. No. 92–1230, [92d Cong., 2d Sess. 187 (1972) ].

*Id.* at 1202. In reviewing the same regulations, another court found that "if perchance the MAC program has the effect of introducing financial considerations into the physician's decision concerning the course of treatment to recommend to his patients, then Congress will have achieved its purpose." *Pharmacist Political Action Committee v. Harris*, 502 F.Supp. 1235, 1244 (D.Md.1980). In *Rasulis v. Weinberger*, 502 F.2d 1006 (7th Cir.1974), the Seventh Circuit held that regulations establishing professional standards that physical therapists must meet to qualify for reimbursement did not constitute coercion or control. The court noted that the Medicare Act requires the Secretary to make rules defining which institutions qualify to provide medical services to beneficiaries. *Id.* at 1010. In *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329 (5th Cir.1975), the Fifth Circuit upheld the government's right to recoup funds from providers who render unnecessary services. The court reasoned that recoupment no more interferes with the practice of medicine than the immediate claims review system established by section

1395f(a)(1). *Id.* at 344; *accord Szekely v. Florida Medical Association,* 517 F.2d 345, 350 (5th Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976).

█ The regulations at issue in the present case instruct intermediaries to compare an agency's costs with those of similar providers to ensure that only reasonable costs are reimbursed. 42 U.S.C. § 1395f(b)(1) (Supp. V 1981); *id.* § 1395x(v)(1)(A) (1976); 42 C.F.R. § 405.-451(c) (1982); Part A Intermediary Letter No. 78–16, at 1–3 (HEW April 1978), J.A. at 4–6 [hereinafter cited as Intermediary Letter]. Costs that are out of line with those of comparable providers are unreasonable unless special circumstances are shown. Intermediary Letter at 3, J.A. at 6. Providers are required to act as "prudent and cost-conscious business[men]" and to "apply sound management principles." *Id.* at 8, J.A. at 11. When applied with a proper respect for the medical judgments of providers, these provisions fulfill Congress's intent of introducing financial considerations into medical decisions and do not unnecessarily infringe on professional judgment. In the instant case Aetna could find no justification for HHC's costs far exceeding those of other providers. To hold HHC to the prudent business standard, it was necessary to restrain HHC's discretion by refusing full reimbursement. We disagree with the district court's determination that the Secretary prohibited the use of leased cars; rather, we find that the Secretary and her agents were attempting to limit the leased car expense to a reasonable level. We hold that comparing providers' costs to locate out-of-line expenses and requiring providers to apply sound business practices, as instructed by the regulations, do not interfere with the practice of medicine in violation of section 1395. Whether the Sec-

retary and her agents complied with the regulations, however, is another question.[11]

**B. *Compliance with the Regulations***

Section 405.451 of the regulations provides that costs are unreasonable if they are "substantially out of line with [those of] other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors." 42 C.F.R. § 405.451(c)(2) (1982). The Secretary gives instructions on applying section 405.451 in Intermediary Letter No. 78–16:

> The first step in proper application of regulations section 405.451(c)(2) is the identification of "comparable" providers against which a particular provider's costs are to be tested for reasonableness. The factors to be considered in identifying comparable providers will vary according to the type of cost being evaluated. Providers need not be similar in all major characteristics; however, they should be comparable in those characteristics which affect the cost under evaluation.
>
> . . . .
>
> Once the comparable provider group has been identified, the providers' costs (after adjustment where necessary to take into account different cost reporting periods), should be arrayed and the range of costs that have been recognized as reasonable for the comparable provider group should be established. . . .
>
> The maximum amount that should be recognized as reasonable for the provider whose cost is under evaluation should be based on careful consideration of all relevant facts and will depend in part on the range and the distribution within the range of the comparable providers' costs, the nature of the cost being evaluated, and the factors other than provider com-

11. We also disagree with the district court's holding that § 1395 does not apply to the Secretary's decision not to reimburse fully for the administrative use of the leased cars. We read § 1395 as barring federal control of decisions concerning both home visits and administrative travel. Perhaps the district court's distinction between administrative travel and home visits was based on the regulations' requirement that the expenses be evaluated for reasonableness separately. *See* Part A Intermediary Letter No. 78–16, at 7 (HEW Apr. 1978), J.A. at 10 [hereinafter cited as Intermediary Letter]. We, however, can find no support for distinguishing between the expenses when applying § 1395.

parability that may affect the level of incurred cost. Unless there are unusual circumstances, the reasonable amount would not exceed the highest cost in the range.

Intermediary Letter at 2–3, J.A. at 5–6.

The Secretary and her agents must, of course, obey the regulations. *Vitarelli v. Seaton,* 359 U.S. 535, 539–40, 79 S.Ct. 968, 972–73, 3 L.Ed.2d 1012 (1959); *United States v. Heffner,* 420 F.2d 809, 811–12 (4th Cir.1969); *Hopewell Nursing Home, Inc. v. Califano,* [1977 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 27,718, at 10,526 (D.S.C.1977), *rev'd on other grounds,* 666 F.2d 34 (4th Cir.1981). Although the intermediary letter states that its purpose is "*to suggest* methodologies or guidelines," Intermediary Letter at 1, J.A. at 4 (emphasis added), the letter's instructions are not merely precatory. We read this less than commanding language as permitting intermediaries to deviate from the letter's methodology when a particular situation calls for it, if the intermediaries explain the basis for the variance, but the intermediaries certainly cannot ignore the letter's instructions.

Before deciding to disallow the leased car costs, Aetna did not identify comparable providers and compare their costs to those of HHC. Rather, Aetna relied on its cumulative experience in dealing with home health agencies to find that HHC's costs were excessive. Before the Board's hearing, however, Aetna surveyed a number of providers and compared their leased car costs to HHC's. Because the Board can receive evidence that was not considered by the intermediary and can reverse the intermediary's findings, 42 U.S.C. § 1395oo(d) (1976), we would find that Aetna's noncompliance was harmless if the subsequent survey had complied with the letter's instructions.

■ The subsequent survey, however, was inadequate. First, Aetna collected data from all of the home health agencies in Florida for which it was the intermediary.[12] Contrary to the regulations, Aetna made no effort to identify which of them were comparable to HHC or to explain why all of them were comparable. Second, after finding HHC's costs excessive, Aetna established the reasonable level of leased car costs by relying on an AAA study on average car costs that was reported in a Fort Lauderdale newspaper. Aetna did not consider all relevant factors in making the determination as required by the intermediary letter. Aetna found that HHC leased too many cars, but it did not consider whether leasing one or two cars to use as standbys would be a reasonable business decision and what effect this decision would have on per mile costs. In fact, there is no indication that Aetna considered any of the characteristics of HHC's business; it merely adopted the AAA's study. Moreover, relying so completely on a newspaper report of a study without checking the accuracy of the report or the methodology of the study is arbitrary agency action, and the findings based on the study are unsupported by substantial evidence.[13]

---

**12.** Testimony of Rolando Rios before the Provider Reimbursement Review Board, at 79 (Feb. 9, 1981), J.A. at 173.

**13.** Also, Aetna did not separately evaluate home visit expenses and administrative travel expenses, as is apparently required by the intermediary letter. Intermediary Letter at 7, J.A. at 10.

HHC argues that Aetna should have compared costs on a cost per visit basis rather than on a cost per mile basis. Because each agency has different business requirements, however, no one figure is dispositive. For example, if one agency's patients are much closer to the agency than a second agency's patients are to the second agency, the first agency will have lower per visit costs but higher per mile costs. Because the alternative to leasing cars is to pay employees for the use of their cars on a mileage basis, it is certainly reasonable to compare the per mile cost of leasing to the per mile cost of using employees' cars even though this comparison is also not dispositive because leasing offers the agencies certain advantages.

HHC also argues that Aetna acted arbitrarily because four of the agencies in the survey received reimbursement at a higher per mile level than HHC. Brief for Appellant/Cross Appellee at 31–32 & n. 26. However, because each determination of reasonableness is made after a consideration of all relevant factors and because each health agency operates in a different business situation, what is a reasonable

We do not suggest that intermediaries must undertake complicated and expensive surveys and write long and detailed reports justifying their findings, especially when small sums are at issue. We hold only that intermediaries must comply with the regulations and intermediary letters or explain why a variance is appropriate in a given situation. Intermediaries certainly may not ignore the regulations and letters as Aetna has done in the present case.

### III. CONCLUSION

We reverse the district court's holding that the Secretary's review of HHC's leased car costs interfered with the provision of medical services in violation of section 1395. However, because Aetna failed to comply with the regulations and the intermediary letters, we remand the case with the instruction that the district court is to remand to the Provider Reimbursement Review Board so that the leased car costs can be evaluated in accordance with the regulations.

*It is so ordered.*

See also, 538 F.Supp. 200.

cost for one agency may not be reasonable for another. This is especially true where there has been no finding that the agencies in the survey are comparable.