**MEMORIAL HOSPITAL/ADAIR COUNTY HEALTH CENTER, INC., Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of the Department of Health and Human Services, et al., Defendants.**

Civ. A. Nos. 84–2518, 82–3208.

United States District Court, District of Columbia.

June 20, 1986.

---

Richard L. Dashefsky, Gibson, Dunn & Crutcher, Washington, D.C., for plaintiff.

Andrew I. Batavia, Office of General Counsel, Dept. Health and Human Services, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

These consolidated cases present an issue as to whether a hospital whose total costs are unexceptional is thereby entitled to reimbursement under the Medicare Act, 42 U.S.C. §§ 1395–1395xx (1982 & Supp. II 1984), for the extraordinary expenses of a single costly state-of-the-art service it elects to operate.

Plaintiff Memorial Hospital/Adair County Health Center ("Memorial"), a small general hospital in rural Oklahoma, asks reimbursement for the Medicare portion of the costs incurred in fiscal years 1979 and 1980 by its full-service "contract pharmacy." The Department of Health and Human Services ("HHS" or "the Secretary") disallowed approximately $80,000 of the costs on grounds that they were "substantially out of line" with the pharmacy costs of similar hospitals in the same geographical area, and that Memorial had not been a "prudent buyer" of pharmacy services when it engaged its pharmacy contractor. The cases are presently before the Court on cross-motions for summary judgment on the administrative record.[1] For the reasons set forth below, the Court concludes that HHS' decision to deny reimbursement was rational and supported by substantial evidence, and will, therefore, grant defendants' and deny plaintiff's motions for summary judgment, and dismiss the complaints with prejudice.

**1.** Jurisdiction is predicated upon 42 U.S.C. § 1395*oo*(f), 5 U.S.C. §§ 701–06 (1982 & Supp. II 1984), and 28 U.S.C. § 1331 (1982). Review is sought pursuant to 5 U.S.C. § 706(2)(E).

## I.

In enacting the Medicare Act in 1965 Congress created a program of health insurance for the aged and disabled. There are two basic components to the Medicare program—hospital insurance, covering expenses of hospital and certain post-hospital services, and supplementary medical insurance, covering professional services by physicians. Only hospital insurance, "Part A" of the program, 42 U.S.C. §§ 1395c–1395i, is involved here.

Under Part A, the federal government reimburses hospitals participating in the Medicare program, known as "providers of services," for the reasonable costs of the services they render to Medicare patients. *See* 42 U.S.C. §§ 1395x(u), 1395f(b). The reimbursement process is overseen by "fiscal intermediaries," usually private health insurance organizations, which act under contract with and as agents of HHS. *See* 42 U.S.C. § 1395h. The "reasonable costs" to which hospitals are entitled are defined in some detail in the Medicare statute, *see* 42 U.S.C. § 1395x(v)(1)(A), in regulations promulgated thereunder, *see* 42 C.F.R. §§ 405.401–482 (1984), and in administrative manuals issued by HHS. *See* Provider Reimbursement Manual §§ 2100, 2102–03; Intermediary Manual § 2130. The reimbursable amount is calculated by apportioning the hospital's total allowable costs between its Medicare and non-Medicare patients. *See* 42 C.F.R. § 405.403.

The primary standard for determining the reasonableness of costs is that expenditures must not be "substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors." 42 C.F.R. § 405.451(c)(2). Expenses do not, however, have to be identical to those of similar institutions; the regulations recognize that costs of services may vary, and that such "variations generally reflect differences in scope of services and intensity of care." *Id.*

In addition, HHS manuals issued to providers and intermediaries declare that a hospital may be reimbursed only if it is a "prudent buyer" of those goods and services for which it requests reimbursement. *See* Provider Reimbursement Manual § 2103; Intermediary Manual § 2130. To be a "prudent buyer" a hospital is expected, "like any ... cost-conscious buyer, [to] refuse to pay more than the going price for an item or service [and to] seek to economize by minimizing cost." Intermediary Manual § 2130.1. *See also* Provider Reimbursement Manual § 2103(A). A hospital which fails to shop wisely may have its extravagance penalized by reductions in its allowable costs, *id.*, and, in making its determination, the intermediary has authority to audit. *See* Intermediary Manual § 2130.1.

A provider dissatisfied with audit adjustments imposed by the fiscal intermediary may appeal the determination to the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395oo. The Secretary, or his delegate, has discretion to review any decision of the PRRB, 42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1875 (1984), and a refusal to review, in an exercise of that discretion, renders the PRRB decision final for exhaustion-of-remedies purposes. 42 U.S.C. § 1395oo(f).

## II.

Memorial is a 50–bed, general acute care, non-profit hospital located in Stilwell, Oklahoma. The area served by Memorial is rural, and its population low income. Over half of Memorial's patients receive Medicare benefits; approximately a quarter are covered by Medicaid. The nearest neighboring hospital is 25 miles away.

In 1977 Memorial opened a new facility, simultaneously contracting with Hospital Pharmacies, Inc. ("HPI") for the latter to provide pharmacy services to the hospital for five years. HPI is the nation's largest pharmacy contractor. Like its competitors, HPI offers more sophisticated—and arguably safer—services than traditional in-house pharmacies staffed with employee-

pharmacists and administered by hospital management.[2]

In 1980 Memorial's fiscal intermediary, Blue Cross of Oklahoma ("BCO"), conducted an audit of Memorial's fiscal year 1979 cost report, thereafter disallowing reimbursement of approximately $36,000 of Memorial's pharmacy costs under the "substantially out of line" and "prudent buyer" rules. Memorial appealed to the PRRB, and in September, 1982, the PRRB upheld the disallowances. The Secretary, by her delegate, then declined to review the Board's decision, making it the final administrative determination, and on November 10, 1982, Memorial filed Civil Action No. 82–3208 in this Court, seeking review of the agency decision.

Memorial's 1980 report suffered a similar fate. In June, 1984, the PRRB upheld BCO's disallowance of approximately $44,-000 in pharmacy costs, and after the Secretary's delegate again declined review, Memorial filed Civil Action No. 84–2518 on August 15, 1984. With the consent of the parties the Court has consolidated the cases.

In its audit of Memorial's fiscal year 1979 report BCO found Memorial's pharmacy costs approximately 45 percent higher than those of the most expensive peer group provider. BCO's survey revealed that the 17 peer hospitals it compared to Memorial had incurred pharmacy costs ranging from $5.78 to $12.42 per patient day. Memorial's cost per patient day was $18.03. The statistics for fiscal year 1980 were more of the same. The per-patient-day costs of peer hospitals ranged from $6.76 to $15.34. At $22.06 per patient day,

Memorial's cost was approximately 42 percent greater than the next highest hospital, and nearly twice the average (mean) cost for the peer group as a whole of $11.14.[3]

Memorial was, however, the only hospital surveyed which had a contract pharmacy. Moreover, even with its significantly higher pharmacy costs, Memorial's *total* costs in both years were below the average of the peer hospitals, and BCO's study showed that Memorial's average length of stay was nearly a full day below the peer group average. Its average daily charge in 1979 was $9 below the peer group average of $223; in 1980 the difference was $37.

### III.

The Medicare Act requires that decisions by the PRRB be "supported by substantial evidence when the record is viewed as a whole." 42 U.S.C. § 1395*oo*(d). *See also* 5 U.S.C. § 706(2)(E).[4] The Court of Appeals for this Circuit has held that the quantity of factual support demanded by the substantial evidence test is "no different from that demanded by the arbitrary or capricious standard." *Association of Data Processing v. Board of Governors of the Federal Reserve System,* 745 F.2d 677, 686 (D.C.Cir.1984). Therefore, under the substantial evidence standard, a court must affirm an agency decision if it can find "a rational basis" in the record for it. *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981); *Diplomat Lakewood, Inc. v. Harris,* 613 F.2d 1009, 1018 (D.C.Cir.1979). *See also Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct.

---

**2.** Contract pharmacies offer two services in-house pharmacies generally do not: unit dose drug distribution and intravenous (IV) admixture, in which pharmacists pre-package medication doses ordered for each patient and add medications to be given intravenously directly to IV solutions when appropriate. Nurses usually perform those functions when the services are not available.

**3.** BCO's methodology in arriving at these figures differed slightly in the two years at issue. In 1979 BCO compared the costs of pharmacy services for a peer group consisting of hospitals with 40–60 beds in Oklahoma. For 1980 BCO

expanded its study to include hospitals in Oklahoma with up to 100 beds whose use varied between 80 and 120 percent of Memorial's, and 15 similarly-sized hospitals in neighboring Arkansas.

**4.** The burden of proof of "reasonable cost" is on the provider seeking reimbursement. *Doctors Hosp., Inc. v. Califano,* 459 F.Supp. 201, 205 (D.D.C.1978). *See also Diplomat Lakewood, Inc. v. Harris,* 613 F.2d 1009, 1018 (D.C.Cir.1979); *Fairfax Hosp. Ass'n v. Califano,* 585 F.2d 602, 611 (4th Cir.1978).

438, 441, 42 L.Ed.2d 447 (1974), *reh'g denied*, 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

*The Substantially Out-of-Line Rule*

Memorial contends that BCO's use of a cost-per-patient-day analysis to compare hospitals is arbitrary and capricious; cost-per-patient-day is, it says, not expressly required by Medicare regulations, nor is it the most accurate measure of a particular service's true costs.[5] (Indeed, one of BCO's witnesses conceded before the PRRB that the method was employed not because it was most accurate, but because it was "simplest.") Memorial maintains that BCO and the PRRB should have given credence, but did not, to a study it commissioned of "pharmacy output" measured in "patient care units" ("PCUs"),[6] which, it claims, is both more flexible than cost-per-patient-day and permits determination of total departmental productivity despite differences in scope and level of services. Using the PCU analysis, a professor of pharmacy called by Memorial testified that he found Memorial's pharmacy costs to be average when calculated as a "cost per unit of work" and the most cost-effective when examined as a relationship between a unit of work and patient day.

Cost-per-patient-day may or may not, however, be as accurate a statistic as PCUs, but it is surely a rational basis of comparison of hospital costs. Not only does it comport with prevailing industry practice,[7] but Medicare regulations specifically require participating hospitals to keep their records in the form of "patient days." *See* 42 C.F.R. § 405.452. HHS has interpreted the reimbursement regulations as calling for the "reasonableness" component to be ascertained in terms of cost per patient day, and "[a] reviewing court may not set aside [an] agency's interpretation merely because another interpretation [is] possible and seems better, so long as the agency's interpretation is within the range of reasonable meanings that the words of the regulation admit." *Psychiatric Institute of Washington, D.C., Inc. v. Schweiker*, 669 F.2d 812, 814 (D.C.Cir.1981) (citations omitted). When, moreover, "the decision under review involves an agency's interpretation of its own regulations, forming part of a complex statutory scheme which the agency is charged with administering, the arguments for deference to administrative expertise are at their strongest." *Id.* at 813–14 (citations omitted). That precept has particular force in matters of cost accounting orthodoxy, given the importance to all Medicare-participating providers that HHS employ consistent and uniform methods for comparing them to one another across the country. *See White Memorial Medical Center v. Schweiker*, 640 F.2d 1126, 1129 (9th Cir.1981).[8]

---

**5.** In providing more comprehensive pharmacy services, pharmacy contractors assume costs which may be actually incurred by hospitals without contract pharmacy services but not reflected in their pharmacy department accounts, e.g., depreciation, interest, insurance, training, and administration. Memorial claims that, after obtaining cost report data from nine hospitals which had contracts with an HPI competitor, it found that its own costs per patient day were lowest. Memorial also adjusted BCO's own peer group comparisons by aggregating all cost centers in which pharmacy costs could be reported, and found that its total per-patient-day cost for pharmacy, IV, central supplies, and medical supplies combined was lower than three of 17 peer hospitals.

**6.** "Patient care units" is a statistic which purports to measure the productivity and effective-

ness of hospitals in ordering medication, conducting clinical activities, and controlling inventory, and attempts to quantify the relationship between the time spent providing service and patient days.

**7.** The American Hospital Association, the only source of national hospital cost data, employs bed size and cost per patient day in comparing operating costs.

**8.** To the extent *Sacred Heart Hosp. v. United States*, 616 F.2d 477, 480, 222 Ct.Cl. 387 (1980), cited by Memorial, seems to suggest otherwise, it appears to be distinguishable. The Court of Claims there held that a cost-per-patient-day comparison of *administrative* costs alone for a specialized service (inhalation therapy) was inappropriate, because the provider hospital performed vastly more procedures than were done

It is in the disparity in scope and quality between its own contract pharmacy and the in-house pharmacies of the peers with which it was compared, however, that Memorial perceives a further instance of administrative arbitrariness. Memorial insists that pharmacy costs simply cannot be compared unless the pharmacies themselves are similar. But neither the statute nor the regulations purport to allow a hospital to decide for itself to upgrade a particular service, and then expect Medicare reimbursements to pay for a portion of the increased cost regardless of the extent to which its Medicare patients may benefit, even if it ultimately spends no more for the service than other hospitals offering the same superior quality, and is otherwise frugal. Not only may the demand for the enhanced service not be found in its usual Medicare patient population, but other services which *are* essential to that population may be sacrificed in the economies demanded to keep total costs down.

Elsewhere in the legislation having to do with the provision of health services Congress has established elaborate controls to ensure that there will not be a superabundance of costly medical services in any particular region of the country in excess of foreseeable demand which are likely to be dependent on federal aid to be viable. *See* Social Security Act § 1122, 42 U.S.C. § 1320a–1 (1982 & Supp. II 1984). *Accord Wilmington United Neighborhoods v. HEW*, 615 F.2d 112, 119–21 (3d Cir.), *cert. denied*, 449 U.S. 827, 101 S.Ct. 90, 66 L.Ed.2d 30 (1980); *NAACP v. Medical Center, Inc.*, 584 F.2d 619, 623 n. 4 (3d Cir. 1978). It is a reasonable deduction from the existence of such legislation that Congress did not intend hospitals to be able to look to Medicare reimbursement to defray the costs of their improvements indirectly, and without oversight as to their relationship to the purposes of the Medicare Act.

Understanding the Act to have been intended to assure that all necessary medical

services are available to as many Medicare-eligible patients as possible, the Court concludes that subsidizing a hospital's elevated aspirations for one of its services by way of disproportionate reimbursements (possibly to the neglect of other services in the same hospital, and the disappointment of other hospitals competing for the same limited government funds) is at variance with the statutory purpose. *See Home Health Care, Inc. v. Heckler*, 717 F.2d 587 (D.C. Cir.1983); *Pleasantview Convalescent and Nursing Center, Inc. v. Weinberger*, 565 F.2d 99 (7th Cir.1976). The Medicare Act vests broad power in the Secretary to control costs of medical care subject to reimbursement which health care providers should not be allowed to circumvent by artful accounting at reimbursement time.

■ In summary, Memorial has failed to establish to the Court's satisfaction that the PRRB's decision to sustain BCO's disallowance of its pharmacy costs was irrational. The Court finds that the Secretary's determination that those costs did not reflect legitimate differences in scope of services and quality of care is supported by substantial evidence.

*The Prudent Buyer Rule*

■ The Court also finds the PRRB's determination that Memorial had been an "imprudent buyer" of pharmacy services is similarly supported by substantial evidence to the effect that Memorial did, in fact, act hastily and unwisely in contracting as it did with HPI.

The circumstances surrounding Memorial's engagement of HPI were sharply in dispute before the PRRB. Memorial asserted that exigent circumstances forced it to move quickly to secure pharmacy services. Two weeks before its new facility was set to open, with only a month's working capital on hand, the hospital underwent a Medicare certification inspection which found the pharmacy service with which it proposed to open to be substandard. Me-

---

in comparably-sized hospitals without such a service; costs would, thus, inevitably be higher. The propriety of the hospital's having under-

taken to offer the specialized service in the first place was never questioned.

morial contended that it had to act rapidly to remedy the deficiency to be certified by Medicare before its money ran out. But even under such temporal and financial constraints, Memorial asserted, it did not act precipitously; its board of directors approved the contract with HPI only after the board itself was convinced that HPI's charges would be reasonable. It then signed a five-year contract with HPI, effective November 1, 1977.

There was evidence before the PRRB, however, that Memorial seriously considered only HPI as an alternative source of pharmacy services after its existing service was disapproved. It never advertised for or contacted the state pharmacists' association to seek applicants for employment, and never solicited bids or proposals from any other independent pharmacy contractors. The hospital board's decision was made, moreover, on the recommendation of its administrator who, after examining HPI's operations at a substantially larger hospital in Oklahoma City, asked for and received the proposal from HPI. The hospital's accountant made a quick, mental estimate of HPI's cost to Memorial which the administrator cursorily presented to the board for an equally perfunctory approval. Memorial did not even know of, much less study, the manner in which pharmacy services were provided at other hospitals of similar proportions, although the information was readily available from several sources, including the Oklahoma Hospital Association.

Those facts alone are sufficient in themselves to constitute substantial evidence in support of the Secretary's determination that Memorial acted imprudently. Had Memorial shown that HPI was, in fact, the only available source of pharmacy services in the fall of 1977, it might have been justified in engaging it, at least for the duration of the emergency. But Memorial

has made no such showing, nor has it offered a satisfactory explanation for the long-term contract. Its protests that it sufficiently canvassed the marketplace before purchasing a service none of its peers could apparently afford is unconvincing.

IV.

Memorial's last claim is that the disallowances were procedurally defective because BCO violated an HHS rule requiring written notice of impending disallowances.[9] Failure to give such notice has been held in the past to render invalid an intermediary's disallowance. BCO did not give Memorial written notice of the disallowances in either year.

■ The Secretary observes that written notice is required only where the intermediary finds that judgments about the "going price" might reasonably differ, and maintains that because Memorial's costs were so out of line, no reasonable difference in judgments about them was possible. Whether or not Memorial should have realized its pharmacy costs were exorbitant, however, there is no evidence in the record that BCO knew what Memorial would ask for in the way of reimbursement until its first claim was submitted, nor what the "going price" was until it had completed its peer surveys. It could not, of course, give notice of what it did not itself know.

For the foregoing reasons, therefore, it is, this 20th day of June, 1986,

ORDERED, that plaintiff's motion for summary judgment is denied; and it is

FURTHER ORDERED, that defendants' motion for summary judgment is granted, and the complaints are dismissed with prejudice.

9. The Medicare Intermediary Manual provides:
   In cases where the intermediary finds that judgments about the "going price" for an item or service might reasonably differ, the intermediary may reimburse the provider for the costs it incurred. In such cases, the intermediary shall send and maintain a record of a written notice to the provider that the costs involved are out of line and that similar costs will be disallowed in the future. Intermediary Manual § 2130.3.