969 F.2d 1163
 297 U.S.App.D.C. 163, Fed. Sec. L. Rep. P 96,887,
133 P.U.R.4th 606
 CITY OF NEW ORLEANS, Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent,
Louisiana Public Service Commission, Cities of Benton et
al., Entergy Corporation et al., Arkansas Public Service
Commission, Mississippi Public Service Commission, Arkansas
Electric Energy Consumers, Intervenors.
LOUISIANA PUBLIC SERVICE COMMISSION, Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent,
City of New Orleans, Arkansas Electric Energy Commission,
Arkansas Public Service Commission, Cities of Benton et al.,
Entergy Corporation et al., Mississippi Public Service
Commission, State of Mississippi, Intervenors.
STATE of MISSISSIPPI, Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent,
Arkansas Public Service Commission, City of New Orleans,
Entergy Corporation et al., Cities of Benton et al.,
Arkansas Electric Energy Commission, Louisiana Public
Service Commission, Mississippi Public Service Commission,
Intervenors.
 Nos. 90-1493, 90-1501 and 90-1506.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 19, 1992.
Decided July 17, 1992.
 
 Clinton A. Vince, with whom Glen S. Ortman, John S. Moot and Michael W. Tifft for City of New Orleans et al., Michael R. Fontham and Noel J. Darce for Louisiana Public Service Com'n and Frank Spencer for the State of Miss. were on the joint brief, for petitioners in Nos. 90-1493, 90-1501 and 90-1506. Paul E. Nordstrom also entered an appearance for petitioners.
 
 
 1
 Judith R. Starr, Special Counsel, S.E.C., with whom James R. Doty, Gen. Counsel, Eric Summergrad, Principal Asst. Gen. Counsel, and Paul Gonson, Sol., were on the brief, for respondent in Nos. 90-1493, 90-1501 and 90-1506.
 
 
 2
 Paul R. Hightower and Mary W. Cochran for Arkansas Public Service Com'n, Richard M. Merriman, Floyd L. Norton IV, James K. Mitchell and Don P. Garber for Entergy Corp. et al. and Zachary D. Wilson for Cities of Benton et al. were on the joint brief for intervenors in Nos. 90-1493, 90-1501 and 90-1506.
 
 
 3
 Michael R. Fontham and Noel J. Darce entered appearances for intervenor Louisiana Public Service Com'n in Nos. 90-1493 and 90-1506.
 
 
 4
 Frank Spencer entered an appearance for intervenor State of Miss. in Nos. 90-1493 and 90-1501.
 
 
 5
 Alfred Winchell Whittaker, Katherine C. Zeitlin and Mitchell F. Hertz entered appearances for intervenor Arkansas Elec. Energy Consumer in Nos. 90-1493, 90-1501 and 90-1506.
 
 
 6
 George M. Fleming and Wm. Bruce McKinley entered appearances for intervenor Mississippi Public Service Com'n in Nos. 90-1493, 90-1501 and 90-1506.
 
 
 7
 Paul E. Nordstrom, Clinton Vince, Glen L. Ortman and John S. Moot entered appearances for intervenors City of New Orleans et al. in Nos. 90-1501 and 90-1506.
 
 
 8
 [297 U.S.App.D.C. 165] Before: MIKVA, Chief Judge, RUTH BADER GINSBURG and HENDERSON, Circuit Judges.
 
 
 9
 Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.
 
 KAREN LeCRAFT HENDERSON, Circuit Judge:
 
 10
 The City of New Orleans, the State of Mississippi and the Louisiana Public Service Commission (petitioners) challenge a Securities and Exchange Commission (SEC or Commission) order approving the acquisition by Entergy, Inc. (Entergy) of a new subsidiary, Entergy Power, Inc. (EPI) and the sale to EPI of two electrical generating units currently owned by an existing Entergy subsidiary. The petitioners claim that certain statutorily required findings made by the SEC pursuant to section 10 of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79a et seq. (PUHCA or Act), are not supported by substantial evidence. In addition, the petitioners claim that the proposed transaction is prohibited by section 11 of PUHCA. Although the Commission properly determined that PUHCA does not prohibit Entergy's proposed transaction, our review of the record reveals that critical findings contained in the Commission's order are not supported by substantial evidence. We therefore remand this case to the Commission for further development of the administrative record.
 
 I.
 
 11
 Entergy is an integrated electric public utility system.[1] An integrated electrical public utility system is a system comprised of one or more generating plants capable of physical connection and of supplying power to one another as needed. See 15 U.S.C. § 79b(a)(29); see also infra p. 1168. The generating plants may be owned by one or more utility/operating companies. Id. Entergy owns four operating companies: Arkansas Power & Light (AP & L), New Orleans Public Service, Inc (NOPSI), Louisiana Power & Light (LP & L) and Mississippi Power and Light (MP & L) (collectively the System). The System's joint operations are governed by an agreement (System Agreement) which is subject to the jurisdiction of the Federal Energy Regulatory Commission (FERC) under the Federal Power Act, 16 U.S.C. § 824 et seq. See Middle South Energy, Inc., 31 F.E.R.C. p 61,305 (1985). Under the System Agreement, power from all System generators is routed to a central facility in Pine Bluff, Arkansas and then distributed in the most economical way.[2] The operating company that owns a particular generating unit, however, has first priority in energy produced by that unit.
 
 
 12
 Although the System Agreement contemplates that each operating company will generate enough power to serve its own customers (JA 356), at various times the companies generate either excess or insufficient power. Under the System Agreement, a company that uses a greater proportion of the System's energy than its own generating units produce must make "reserve equalization payments" to the company (or companies) using a lesser proportion of the System's energy than its own generating units produce.
 
 
 13
 This case involves two generating facilities owned by AP & L. Unit 2 of the Independence Steam Electric Generating Station (ISEGS 2) is a coal-fired plant and Unit 2 of the Ritchie Steam Electric Generating Station (Ritchie 2) is an oil and gas-fired plant (collectively "the spin-offs"). Currently, Entergy is experiencing a System-wide surplus and these plants represent excess capacity. Under the System Agreement, reserve equalization payments are determined by comparing the amount of power used by the paying company with the amount it generates. These payments thus do not afford full compensation to a company that carries capacity not needed by the System. The upshot here is that AP [297 U.S.App.D.C. 166] & L's customers could be saddled with the large costs of the ISEGS and Ritchie plants without corresponding benefit. In part to avoid this result, AP & L entered into an agreement with the State of Arkansas whereby AP & L was allowed to sell its interest in the spin-offs to EPI. EPI would then sell the power generated by the spin-offs to wholesale purchasers outside the Entergy system. Any remaining power from these plants not sold by EPI would be available first to AP & L at a price equal to EPI's incremental cost and then to the other operating companies in the System. A hearing was held before the Arkansas Public Service Commission (APSC) and, based on testimony from witnesses on behalf of AP & L and the APSC staff and a 1988 cost of service study (1988 Study), the APSC approved AP & L's sale of the spin-offs to EPI. The 1988 study predicted savings for AP & L ratepayers under the arrangement and predicted that the System's power needs would not increase to the point that replacement of the spin-off plants would be required until the turn of the century.
 
 
 14
 On June 29, 1990, FERC approved EPI's proposed use of AP & L's transmission lines to sell power outside the System. Entergy Servs., Inc., 51 F.E.R.C. p 61,376, reh'g denied, 52 F.E.R.C. p 61,317 (1990). Soon thereafter, the City of New Orleans (City), which, under Louisiana law, has authority to regulate public utilities within its boundaries, filed a complaint with FERC seeking rate relief. City of New Orleans v. Entergy Corp., 54 F.E.R.C. p 61,298, clarified and rehearing denied, 55 F.E.R.C. p 61,221 (1991). The City contended that AP & L's plan would cause the City's ratepayers' costs to rise due to (1) the increased cost of energy resulting from the change to a more expensive generation method[3] and (2) the cost of replacing the spin-off plants when additional capacity is needed in the future. Id. FERC is currently investigating the first issue but has postponed addressing the second issue on the ground that the issue of plant replacement costs is not yet ripe for analysis. See 55 F.E.R.C. at p 61,221.
 
 
 15
 The proposed sale of AP & L's interest in the spin-offs to EPI also requires the SEC's approval. Pursuant to PUHCA, the Commission regulates the corporate structure of public utility holding companies and their acquisition of securities and assets. See Wisconsin Envtl. Decade, Inc. v. SEC, 882 F.2d 523, 524 (D.C.Cir.1989).[4] The Commission reviewed the AP & L/EPI transaction and approved it. See Entergy Corporation, et al., Memorandum Opinion and Order Authorizing Issuance, Sale and Acquisition of Securities; Sale and Acquisition of Utility and Nonutility Assets; Indemnification Agreements; Operational and Service Agreements; and Denying Requests for Hearing, Holding Company Act Release (HCAR) No. 25136 (August 27, 1990) (Order). The petitioners appeal the Commission's decision.
 
 II.
 A.
 
 16
 The petitioners first claim that the Commission did not adequately support its findings as required by PUHCA. Section 10(c)(2) of PUHCA requires the Commission to make an affirmative finding that an acquisition "will serve the public interest by tending towards the economical and efficient development of an integrated public-utility system." 15 U.S.C. § 79j(c)(2). In concluding that AP & L's sale of the spin-off plants to EPI will result in a net economic benefit to the System, the Commission relied heavily on the fact that the other System members will no longer be responsible for the reserve equalization costs associated with the spin-off plants' excess capacity. Order at 34. While acknowledging that this expense will be eliminated,, [297 U.S.App.D.C. 167] the petitioners insist that the Commission's decision failed to take into account (1) the System's increased costs that will result from having to replace the spin-off plants in the future and (2) the fact that System costs will increase because alternative sources of energy available to the System are more expensive than the type used by the spin-off plants.[5] Having reviewed the record, we conclude that the Commission failed to adequately address these matters.
 
 
 17
 The Commission asserts that the 1988 Study demonstrates that the costs of replacing generating capacity in the future will be outweighed by the benefits derived from selling the spin-off plants (SEC Br. at 25). Although the 1988 Study considered the total capacity of the System in drawing its conclusions regarding replacement costs, its conclusions are stated in terms of savings to AP & L ratepayers only. Order at 33. The Commission made no further effort to explain how replacement costs would affect other System utilities' ratepayers. The 1988 Study, we recognize, is relevant to the Commission's inquiry, although not sufficient to carry the day because it failed explicitly to recognize costs borne by non-Arkansas ratepayers. We further recognize that the Commission's ultimate conclusion--that the toll on the System and ratepayers of sale and replacement is less than that of carrying excess capacity--may well prove correct. PUHCA, however, requires a showing of cost savings to the entire System. That showing has not yet been made.
 
 
 18
 The Commission's order does mention the increased costs of shifting to a more expensive energy source (i.e. an oil and gas plant). A footnote to the order cites figures supplied by Entergy that seem to support a conclusion that the System would achieve economic benefits despite the increased costs of changing to a more costly energy source. Id. at 34 n. 42; see also JA 779-781. Our review of the record reveals no explanation or underlying support for the estimates supplied by Entergy. We have held that an agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data "is arbitrary agency action, and the findings based on [such a] study are unsupported by substantial evidence." Home Health Care, Inc. v. Heckler, 717 F.2d 587, 592 (D.C.Cir.1983) (footnote omitted); cf. Ohio Bell Tel. Co. v. Public Utils. Comm'n, 301 U.S. 292, 303, 57 S.Ct. 724, 730, 81 L.Ed. 1093 (1937) ("[H]ow was it possible for the appellate court to review the law and the facts and intelligently decide that the findings of the Commission were supported by the evidence when the evidence that it approved was unknown and unknowable?"). If the Commission knew of the methodology used by Entergy in collecting its plant replacement data, we can find no evidence of its knowledge in the record.[6]
 
 B.
 
 19
 The petitioners next claim that regardless whether the Commission adequately supported its findings under subsection 10(c)(2) of PUHCA, the Commission's order violates subsection 10(c)(1) of [297 U.S.App.D.C. 168] the Act. Section 10(c)(1) of PUHCA requires the Commission to disapprove a proposed transaction if it will be "detrimental to the carrying out of the provisions of section [11 of PUHCA]." 15 U.S.C. § 79j(c)(1). The petitioners therefore argue that the SEC should have disapproved the transaction because, they claim, Entergy's acquisition of EPI violates the requirements of PUHCA subsection 11(b)(1). That subsection requires the Commission to "limit the operations of the holding-company system ... to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system." 15 U.S.C. § 79k(b)(1). The Act defines "integrated system" as
 
 
 20
 a system consisting of one or more units of generating plants and/or transmission lines and/or distributing facilities, whose utility assets, whether owned by one or more electric utility companies, are physically interconnected or capable of physical interconnection and which under normal conditions may be economically operated as a single interconnected and coordinated system confined in its operations to a single area or region.
 
 
 21
 15 U.S.C. § 79b(a)(29)(A). While the petitioners concede that the spin-off companies will be physically interconnected to the system, they claim that the spin-offs will not be economically integrated. Specifically, the petitioners contend that the System will not have control over the use of power from those plants should such use become economically desirable.
 
 
 22
 The Commission, on the other hand, argues that the acquisition does not adversely affect integration. Its order concludes that, because AP & L has always been free to sell electricity to nonmember utilities, the EPI transaction merely reflects a change in corporate form. Order at 29. We find the Commission's position reasonable.
 
 
 23
 The Commission reached a similar conclusion in Sierra Pacific Resources, Memorandum Opinion and Order Authorizing Acquisition of Common Stock of New Electric Generating Company and Denying Requests for Hearing, HCAR No. 35-24566 (Jan. 28, 1988), which was upheld by the Ninth Circuit in Environmental Action, Inc. v. SEC, 895 F.2d 1255, 1263 (9th Cir.1990) (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)).[7] We see no reason to disagree with the Ninth Circuit. The petitioners insist that the statutory phrase "economically operated" must mean "operated so that every unit of power is offered first for in-System use." Although that reading might be consistent with the words of section 11, it is by no means the required one. The Commission reads "economically" to impose a less stringent requirement, i.e., that facilities, in addition to their physical interconnection, be consolidated so as to take advantage of efficiencies. We are satisfied that the Commission's interpretation neither contravenes Congress's intent nor is "unreasonable." See Chevron.[8][297 U.S.App.D.C. 169] III.
 
 
 24
 The Commission did not reveal or explain the methodology used to calculate the data underlying its conclusions regarding the effect of shifting to alternative energy sources, and it failed to address directly the effect of plant replacement costs on the petitioners. Accordingly, we remand this case for further development of the administrative record as it relates to these two issues. We reject the petitioners' claims that the Commission's approval of the proposed transaction violated section 10(c)(1) of the Public Utility Holding Company Act.
 
 
 25
 So ordered.
 
 
 
 [1]
 Entergy was previously known as Middle South Utilities, Inc
 
 
 [2]
 Entergy uses nuclear plants, coal-fired plants and oil and gas-fired plants. Nuclear energy is the least expensive while energy generated from oil and gas-fired plants is the most expensive
 
 
 [3]
 The proposed sale of Ritchie 2, which generates energy by the oil and gas burning method, would not have this effect
 
 
 [4]
 Both houses of Congress have recently voted to amend PUHCA. These bills are currently pending action by a conference committee. See Thomas W. Lippman, House Approves Vast Energy Bill, Wash. Post, May 28, 1992, at A1 (discussing House passage of 1991 H.R. 776)
 
 
 [5]
 Entergy acknowledges that the sale of the spin-offs will result in increased energy costs. See Order at 34 n. 42
 
 
 [6]
 The petitioners claim that they were improperly denied a hearing on these issues. We have recognized that "evidentiary hearings are required only when a genuine issue of material fact exists." Wisconsin's Envtl. Decade, Inc., 882 F.2d at 526; see also Woolen Mill Assocs. v. FERC, 917 F.2d 589, 592 (D.C.Cir.1990). The proponent of such a hearing "must make a minimal showing that material facts are in dispute" and may not rely on mere "bald or conclusory allegation[s] that such a dispute exists." Connecticut Bankers Ass'n v. Board of Governors of Fed. Reserve Sys., 627 F.2d 245, 251 (D.C.Cir.1980). The petitioners argue that it was impossible for them to make the required showing because the methodology relied on by Entergy was unavailable to them. We assume that on remand the petitioners will be given the opportunity to evaluate and respond to the supplemental material and, if at that time the petitioners can demonstrate that material facts are in dispute, a hearing probably should be held. But see Boston Carrier, Inc. v. ICC, 728 F.2d 1508, 1511 n. 5 (D.C.Cir.1984); Louisiana Ass'n of Independent Producers v. FERC, 958 F.2d 1101, 1113 n. 4 (D.C.Cir.1992) (per curiam)
 
 
 [7]
 The petitioners claim that the holding in Sierra Pacific Resources represented an about face by the Commission. We do not agree. In Electric Energy, Inc., 38 S.E.C. 658 (1958) (cited with approval in Environmental Action, Inc., 895 F.2d at 1263), the Commission stated that an acquired company is economically interconnected to an existing system if the generation, transmission and distribution functions of the acquired company can be efficiently coordinated with those of the existing system. Id. at 671
 The cases cited by the petitioners are inapposite. The most pertinent case they cite is The North American Co., 11 S.E.C. 194 (1942). There the Commission found that certain power stations, although physically connected to the main integrated system, were not economically integrated. Id. The reason the power stations were not economically connected, however, was that, despite physical interconnection, the power from those plants could not be transported throughout the system. Id. at 242. This is not the case with EPI's plants.
 
 
 [8]
 The petitioners claim that because Congress exempted from section 11(b)(1) only those companies acquiring interests in electricity cogeneration facilities and gas pipeline companies, this court must assume that Congress did not intend to exempt holding company subsidiaries that plan to sell their electricity to non-system utilities. In view of our conclusion that the EPI transaction is permitted under section 11, we need not address the petitioners' exemption argument