48 F.3d 1220
 Medicare & Medicaid Guide P 43,130
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
The UNIVERSITY OF KENTUCKY, Plaintiff-Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 94-5175.
 United States Court of Appeals, Sixth Circuit.
 Feb. 28, 1995.
 
 Before: JONES, CONTIE, AND MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff University of Kentucky ("University") appeals the district court's grant of summary judgment in favor of defendant Donna E. Shalala, the Secretary of Health and Human Services ("Secretary"), in this action filed pursuant to the Administrative Procedure Act, 5 U.S.C. Sec. 706, and 42 U.S.C. Sec. 1395oo(f)(1), seeking judicial review of the Secretary's reduction of the Medicare reimbursement under Part A to plaintiff's University Hospital for the fiscal year ending June 30, 1987. On appeal, the issue presented for review is whether the district court erred in granting summary judgment in favor of the Secretary. Specifically, we must address the issue of whether the Secretary's decision is arbitrary, capricious, not supported by substantial evidence, or contrary to law. The Secretary determined that the outpatient clinics in the Medical Plaza building, which is located across the street from plaintiff's University Hospital, are not hospital clinics but, rather, are freestanding clinics for purposes of determining the hospital's reimbursement under Part A of Medicare for the indirect costs of medical education.
 
 I.
 
 2
 The University argues that the Secretary's decision that the clinics in the Medical Plaza Building are not hospital outpatient departments, but rather are freestanding clinics for purposes of determining the hospital's reimbursement under Part A of Medicare for the indirect costs of medical education is arbitrary, capricious, not supported by substantial evidence, and contrary to law. However, after a thorough review of the record, the briefs of the parties, and after oral argument, we shall affirm the district court's grant of summary judgment for the reasons stated in the district court's memorandum opinion of January 13, 1994.[1] See Loyola Univ. of Chicago v. Bowen, 905 F.2d 1061, 1066 (7th Cir.1990); Vallejo Gen. Hosp. v. Bowen, 851 F.2d 229, 230-31 (9th Cir.1988).
 
 
 3
 We conclude that the district court correctly upheld the final decision of the Secretary. The Secretary's interpretation of the applicable Medicare statutes, requiring that the outpatient clinics in the Medical Plaza building be treated as either freestanding or an outpatient department of the hospital on a consistent basis for all Medicare reimbursement purposes is neither arbitrary, capricious, nor contrary to law. Furthermore, the Secretary's conclusions that the outpatient departments in the Medical Plaza building are freestanding clinics, rather than outpatient departments of plaintiff's University Hospital, is supported by substantial evidence.
 
 
 4
 Adoption of the position advocated by the University in this case would result in duplicative payments for services rendered in the outpatient clinics in the Medical Plaza building, a result which is clearly inconsistent with Congress' intent in enacting section 104 of the TEFRA[2] amendments to the Social Security Act and section 9104 of the COBRA amendments to the Social Security Act. The only way to avoid duplicative payments for services rendered is to treat the clinics as either freestanding clinics or hospital outpatient departments for reimbursement purposes under both Part A and Part B of Medicare.
 
 
 5
 In the decision of the HCFA Administrator, the Administrator found that section 104 of TEFRA and section 9104 of COBRA were in pari materia and should be construed together. The approach taken by the Secretary in reading these various sections consistently finds support in case law. The District of Columbia Circuit Court of Appeals has recognized that the various provisions of the Medicare Act "must be read together 'to produce a symmetrical whole.' " Home Health Care, Inc. v. Heckler, 717 F.2d 587, 590 (D.C.Cir.1983) (quoting Federal Power Comm'n v. Panhandle E. Pipe Line Co., 337 U.S. 498, 514 (1949)). Furthermore, the Supreme Court recently stated that where the Secretary's interpretation of a statute "closely fits 'the design of the statute as a whole and ... its object and policy,' " the courts "should be especially reluctant to reject" such interpretations. Good Samaritan Hosp. v. Shalala, 113 S.Ct. 2151, 2161 (1993) (quoting Crandon v. United States, 494 U.S. 152, 158 (1990)).
 
 
 6
 When the Secretary published the final indirect medical education, IME, regulations in September 1985, the regulations provided that the time spent by residents and interns in both hospital outpatient departments and freestanding clinics should be excluded from the ration used to calculate the IME. 50 Fed.Reg. 35646 (Sept. 3, 1985) (codified at 42 C.F.R. Sec. 412.118 (1985)). Responding to the Secretary's final IME regulation, Congress provided that the time spent by interns and residents in hospital outpatient departments should be included in the IME calculation. COBRA, Sec. 9104, 42 U.S.C. Sec. 1395ww(d)(5)(B).
 
 
 7
 Thus, Congress rejected only that portion of the Secretary's final IME rule dealing with time spent by residents and interns in hospital outpatient departments. However, Congress did not reject that portion of the IME rule dealing with time spent in freestanding clinics. "Where 'an agency's statutory construction has been "fully brought to the attention of the public and Congress," and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.' " Michigan United Conservation Clubs v. Lujan, 949 F.2d 202, 210 (6th Cir.1991) (quoting United States v. Rutherford, 442 U.S. 544, 554 n. 10 (1979) (quoting Apex Hosiery Co. v. Leader, 310 U.S. 469, 487-89 (1940))).
 
 
 8
 The University also argues that HCFA, and hence, the Secretary, was not required to determine that the clinics in the Medical Plaza building were freestanding when it concluded that the physicians who practiced in the Medical Plaza buildings were entitled to an exemption from the TEFRA limitation. The University argues that in deciding to grant the exemption from the TEFRA limitation, HCFA merely had to determine whether the physicians who practiced in the clinics in the Medical Plaza building were bearing all of the overhead for the clinics, rather than determining whether the clinics were freestanding or hospital outpatient departments.
 
 
 9
 The district court, however, rejected the University's argument. It found that in granting KMSF's request for a TEFRA exemption, "HCFA specifically found that the Clinics met 'the criteria of freestanding ...' " J.A. 50. The district court also found that "it is clear that in order to grant KMSF's request to exempt the Clinics from the TEFRA limitation, the Secretary was required to determine that the Clinics should be classified as freestanding in 1985." J.A. 51.
 
 
 10
 In enacting section 104 of TEFRA, Congress directed the Secretary to issue regulations placing limitations on the reasonable charges for physician services rendered in hospital outpatient settings by considering the extent to which overhead costs associated with the outpatient services had been included in the reasonable costs of the hospital. The legislative history of section 104 of TEFRA states:
 
 
 11
 The location where a physician's service is performed, (i.e., physicians' office or hospital outpatient department) has an important bearing on whether there are overhead costs for which he is responsible. While a physician pays for his office overhead (e.g., utilities, nursing staff, etc.), similar costs for services he renders in an outpatient department are borne by the hospital and covered by the hospital's reimbursement.
 
 
 12
 Sen.Rep. No. 494, 97th Cong., 2d Sess. 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 804-05. This language indicates that the Secretary should consider overhead costs in determining whether or not to reduce reimbursement to physicians under Part B.
 
 
 13
 Furthermore, there is nothing inconsistent about the Secretary's actions in the interpretation of the regulations in this case. Prior to October 1985, the Secretary denied KMSF's request for an exemption, and the Secretary treated the clinics in the Medical Plaza building as part of the hospital's outpatient department. However, after October 1985, the Secretary determined that the physicians who practiced in the Medical Plaza building were entitled to a TEFRA exemption.
 
 
 14
 The University argues that nothing happened between the time the Secretary first denied KMSF's request for an exemption from the TEFRA limitation for the physicians who practiced in the clinics in the Medical Plaza building and the time the request for an exemption from the TEFRA limitations was granted in October 1985, to change the status of the clinics in the Medical Plaza building from that of outpatient departments of the hospital. However, as the PRRB noted in its decision, "the only thing that changed between 1983, when HCFA determined that the clinics were part of the Hospital, and 1985, when HCFA concluded that the clinics were not part of the Hospital, was the Hospital's agreement to stop charging the $6 clinic fee and the physicians' agreement to reimburse the Hospital for all costs of operating the clinic." J.A. 78.
 
 
 15
 Thus, by October 1985, the hospital had stopped paying the costs of overhead for the clinics in the Medical Plaza building, and the overhead costs for the clinics stopped appearing in the hospital's cost report for Part A reimbursement. More importantly, the Secretary recognized that the physicians who practiced in the clinics in the Medical Plaza building were paying the costs of operating the clinics, and, accordingly, HCFA granted them a TEFRA exemption as of October 1985. Furthermore, as found by the district court, it is significant that neither the University nor the University Hospital challenged either the finding that the clinics in the Medical Plaza building were freestanding or the concomitant increase in the Part B reimbursement to the physicians who were practicing in the clinics in the Medical Plaza building until the Hospital's Intermediary reduced the Hospital's Part A reimbursement more than three years later.
 
 
 16
 Furthermore, the position of the Secretary has been consistent. Rather, it is the status of the clinics in the Medical Plaza building and the position of the University Hospital which has changed. In September 1985, University Hospital announced that it would discontinue its $6 charge for visits to the clinics in the Medical Plaza building if the physicians in the clinics would pay the costs of the clinics. It is obvious that this change, namely, the physicians paying the overhead costs for the clinics in the Medical Plaza building, was designed to induce HCFA to grant KMSF's renewed request for a TEFRA exemption for the physicians practicing in the Medical Plaza building clinics.
 
 
 17
 Moreover, in order to grant the TEFRA exemption, HCFA necessarily had to find that the clinics were freestanding and not outpatient departments of the hospital.[3] In addition, the hospital acquiesced in the Secretary's action until the Secretary sought to apply the determination that the Medical Plaza building clinics were freestanding consistently under both Parts A and B of Medicare, causing the hospital to suffer adverse economic consequences to its Part A reimbursement.
 
 
 18
 In addition, the cases relied on by the University, namely University of North Carolina v. Bowen, No. C-87-427-D, 1988 WL 235549 (M.D.N.C. June 8, 1988), aff'd, 887 F.2d 1082 (4th Cir.1989) and University of Cincinnati v. Bowen, 875 F.2d 1207 (6th Cir.1989), are distinguishable from this case. Both of these cases involve, at least in part, the direct costs of medical education. Furthermore, in both cases the hospitals involved were paying some of the costs of the outpatient clinics at issue, facts which clearly differ from this case where there is no dispute that the physicians who practiced in the Medical Plaza building clinics were paying the costs of operating those clinics.
 
 
 19
 Finally, the University's arguments that substantial evidence does not support the Secretary's decision is meritless. The University focuses on the responses to the HCFA questionnaire, which dates from the time KMSF renewed its request for a TEFRA exemption in 1985.
 
 
 20
 Some of the responses indicated that the clinics in the Medical Plaza building had close ties to the University Hospital and some of the responses indicated that the clinics could be considered freestanding for purposes of Medicare reimbursement. We conclude that based upon the responses to the HCFA questionnaire, substantial evidence exists to support a conclusion by the Secretary that the clinics in the Medical Plaza building were outpatient departments of plaintiff's University Hospital and substantial evidence exists to support the Secretary's factual finding that the clinics are freestanding for Medicare purposes. Nevertheless, because there is substantial evidence to support the Secretary's conclusion that the clinics are freestanding, we will not reverse the Secretary's decision even though there is also substantial evidence to support the opposite conclusion. See Papendick v. Sullivan, 969 F.2d 298, 301 (7th Cir.1992) ("Further, '[t]he existence of an evidentiary dispute, in and of itself, does not present a ground for reversing the ... decision to credit one particular version of the events over another.' " (citing Herr v. Sullivan, 912 F.2d 178, 181 n. 4 (7th Cir.1990), cert. denied, 113 S.Ct. 968 (1993).
 
 
 21
 In addition, the University suggests that the HCFA questionnaire should not be relied upon to determine the status of the clinics in the Medical Plaza building, because in filling out the questionnaire the physicians may not have understood that their responses would be used to determine the status of the clinics for a TEFRA exemption. However, when KMSF renewed its request for a TEFRA exemption, HCFA sent a letter to KMSF indicating that the responses to the questionnaire would determine whether or not the TEFRA exemption would be granted. Moreover, before the PRRB the University relied on the answers to the questionnaire, asserting that the answers to the questionnaire showed that the clinics in the Medical Plaza building were still hospital outpatient departments.
 
 
 22
 Therefore, we conclude that the decision of the Secretary is neither arbitrary, capricious, nor contrary to law, and that the Secretary's decision is supported by substantial evidence. Thus, the district court did not err in its grant of summary judgment in favor of the Secretary.
 
 II.
 
 23
 For the reasons stated, the district court's judgment is AFFIRMED.
 
 
 24
 NATHANIEL R. JONES, Circuit Judge, concurring.
 
 
 25
 I concur in the majority's opinion. Nevertheless, I write separately to note my disagreement with the majority's view that the position that the University advocates would absolutely result in duplicative payments. No such factual showing has been made in this case. Instead, this remains a disputed and unresolved factual determination. Throughout the briefs and oral arguments presented to this court, the Secretary argued that duplicative payments would result if the University was allowed to count resident time in the clinics in its IME formula while the clinics received the TEFRA exemption--a situation that clearly violated Congress' intent in enacting section 104 of TEFRA. The University contended that no such duplicative payments would occur, and thus Congress' intent was not so violated.
 
 
 26
 I believe the most equitable way to resolve the issue before this court would have been to remand this case so that the Secretary could make a factual determination as to whether the inclusion of residents working in the clinics in the calculation of the IME reimbursement would result in duplicative payments. At oral argument, however, counsel for the University asserted that it would be virtually impossible to make such a factual determination. If the University feels that it is not possible to show that no duplicative payments have occurred, then this is not a fact that can affect the outcome of this litigation, and thus is not material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Because remand will not resolve this factual dispute, summary judgment is appropriate here. See County of Oakland v. City of Berkley, 742 F.2d 289, 298 (6th Cir.1984) ("The function of summary judgment is to avoid a useless trial"). Consequently, in this case, I agree that the Secretary's interpretation of the Medicare statutes was appropriately decided as a matter of law. See Oklahoma ex rel. Dep't of Human Servs. v. Weinberger, 741 F.2d 290, 291 (10th Cir.1983) (noting that questions of statutory construction and legislative history present legal questions properly resolved by summary judgment).
 
 
 
 [1]
 Furthermore, because we believe that the district court's opinion of January 13, 1994, adequately sets forth the relevant facts in this case, we have not found it necessary to repeat them in this opinion
 
 
 [2]
 In this opinion, TEFRA stands for the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97-249; COBRA stands for the Consolidated Omnibus Reconciliation Act of 1985, Pub.L. 99-272, Section 9104.; KMSF stands for Kentucky Medical Services Foundation; IME stands for Indirect Medical Education; HCFA stands for the Health Care Finance Administration; and PRRB stands for the Provider Reimbursement Review Board
 
 
 [3]
 When KMSF's renewed request for a TEFRA exemption was granted in October 1985, the Secretary necessarily found that the clinics were freestanding. Once the Secretary determined that the physicians practicing in the Medical Plaza building clinics were paying the overhead costs of operating the clinics, they became freestanding under the Medicare regulations; i.e., they were no longer part of the hospital for purposes of the hospital's cost report for Part A reimbursement