**MEMORIAL HOSPITAL/ADAIR COUNTY HEALTH CENTER, INC., Appellant**

**v.**

**Otis R. BOWEN, M.D., Secretary of Health & Human Services, et al.**

**Nos. 86–5572, 86–5573.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 13, 1987.
Decided Sept. 18, 1987.

Patric Hooper, Los Angeles, Cal., with whom Robert A. Klein, Washington, D.C., was on the brief, for appellant.

Edgar C. Morrison, Jr., Atty., Health & Human Services, with whom Richard K. Willard, Asst. Atty. Gen., and Joseph E. diGenova, U.S. Atty., Washington, D.C., were on the brief, for appellees. Henry R. Goldberg, Atty., Health & Human Services, Baltimore, Md., also entered an appearance for appellees.

Before SILBERMAN, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

BUCKLEY, Circuit Judge:

The Secretary of Health and Human Services issued two decisions denying a rural hospital in Oklahoma full reimbursement for pharmacy services rendered to Medicare patients in 1979 and 1980. The Secretary's decisions are based on findings of Medicare's Provider Reimbursement Review Board which found Memorial's pharmacy costs to be unreasonable. The hospital, Memorial Hospital/Adair County Medical Center, disagreed with the Board's conclusions and filed complaints challenging the two decisions. The district court consolidated the complaints and granted summary judgment for the Secretary. We now reverse, holding that the Board's findings disregarded the Secretary's Medicare reimbursement regulations. We remand these cases to the district court with instructions to set aside the Secretary's decisions.

## I. BACKGROUND

In 1983 Congress changed the method of reimbursing hospitals for costs incurred in caring for Medicare patients. *See Washington Hosp. Center v. Bowen,* 795 F.2d 139, 141–42 (D.C.Cir.1986) (discussing Social Security Amendments of 1983). Under the new system the Department of Health and Human Services ("HHS" or "Department") reimburses Medicare health care providers, including hospitals like Memorial, according to standard national rates for particular therapies. *Id.* at 142.

This case arises under the Medicare reimbursement scheme previously in effect. In Part A of the Social Security Act, 42 U.S.C. §§ 1395c–1395i (1982) (the "Act"), Congress permitted the Secretary of HHS to consider cost audits before approving hospital applications for Medicare reimbursement. Section 1395f(b) of the Act states:

> The amount paid to any provider of services ... with respect to services for which payment may be made under this part shall, subject to the provisions of sections 1395e and 1395ww of this title, be—

(1) except as provided in paragraph (3) [not applicable here], the *lesser* of (A) the reasonable cost of such services, as determined under section 1395x(v) of this title and as further limited by section 1395rr(b)(2)(B) of this title, or (B) the customary charges with respect to such services;

\*　　\*　　\*　　\*　　\*　　\*

42 U.S.C. § 1395f(b) (1982) (emphasis added). The Secretary did not base his decisions on the "customary charges" subsection of that provision. Rather, he premised them on the "reasonable cost" provision of section 1395f(b)(1)(A), which incorporates the definition of "reasonable cost" appearing in title 42 U.S.C. § 1395x(v)(1)(A). This in turn provides that "[t]he reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations...." 42 U.S.C. § 1395x(v)(1)(A) (1982).

The Secretary published, among others, the following regulation:

Reasonable cost includes all necessary and proper costs incurred in rendering the services [covered under the Act], subject to principles relating to specific items of revenue and cost. However, ... payments to providers of services are based on the lesser of the reasonable cost of services ... or the customary charges to the general public for such services, as provided for in § 405.455.

42 C.F.R. § 405.451(a) (1985). The regulation further defines "reasonable cost" in a broad fashion:

The costs of providers' services vary from one provider to another and the variations generally reflect differences in scope of services and intensity of care. The provision in title XVIII of the Act for payment of reasonable cost of services is intended to meet the actual costs, *however widely they may vary from one institution to another.* This is subject to a limitation where a particular institution's costs are found to be *substantially out of line with other institutions in the same area which are sim-ilar in size, scope of services, utilization, and other relevant factors.*

42 C.F.R. § 405.451(c)(2) (1985) (emphasis added).

In addition to this regulation, section 2103 of the Secretary's Provider Reimbursement Manual (HCFA Pub. 15–1) ("Manual") informs Medicare health care providers of their responsibilities. The Secretary relies in part on that section of the Manual to support his decisions. Paragraph A of section 2103 states that "[t]he prudent and cost-conscious buyer not only refuses to pay more than the going price for an item or service, he also seeks to economize by minimizing cost." Paragraph B adds that intermediaries may "employ various means for investigating and detecting" excessive spending. "Included may be such techniques as comparing the prices paid by providers to the prices paid for similar items or services by comparable purchasers, spotchecking, and querying providers about indirect, as well as direct, discounts." Manual, J.A. Exhibit D.

Memorial is a fifty-bed general hospital located in Stilwell, Oklahoma. It is not operated for profit. During the fiscal year ending on September 30, 1979, "[i]ts percent of occupancy was 63.76 and its Medicare utilization was 62.2 percent." *Memorial Hospital (Stilwell, Okla.) v. Blue Cross Assoc./Blue Cross/Blue Shield of Oklahoma,* [1982–83 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 32,272 at 9350 (Sept. 22, 1982) ("*Memorial I*"). Two weeks before it was ready to open in 1977, Memorial's administrator requested Oklahoma State Health Department personnel, then under contract with the Secretary, to " 'survey' [Memorial's] facilities to determine whether ... Medicare standards are satisfied." Brief for Appellees at 6, 6 n. 4. "This team found [Memorial's] pharmacy to be very deficient in pharmacy services." *Memorial I* at 9350 (citation omitted). When Memorial's administrator asked how that deficiency could be corrected,

[t]he surveyor told him to come to Oklahoma City (Doctors Hospital of Oklahoma) to observe an acceptable pharma-

cy operation. He observed a contract pharmacy, HPI [Hospital Pharmacies, Inc.], for the first time. He requested HPI to survey the provider [sic] and provide it with a proposal for operating the pharmacy.

*Id.* (citation omitted).

HPI's proposal offered Memorial's patients the most advanced of three commonly used methods for administering medications. Some hospitals keep a stock of drugs in each ward or floor, permitting nurses to retrieve and administer supplies without supervision by a pharmacist. According to Memorial, that system "poses a threat to patient safety ... [and] can result in decreased care to patients and financial loss to hospitals employing this procedure." Brief for Appellant at 10. Other hospitals use a second method. They store drugs in a pharmacy where a pharmacist places each patient's medications in prescription containers and distributes them to nurses for dispensation. These may contain large quantities of medication for use over several days. In HPI's proposal an HPI pharmacist would prepare each single dose for each patient and, whenever prescribed, mix drugs in intravenous solutions for particular patients under sterile conditions ("intravenous" or "IV admixture"). In exchange Memorial would compensate HPI an amount equal to forty-five percent of the gross inpatient billings of the pharmacy department, less five percent of said billings to cover bad debts. *Memorial I* at 9351.

After HPI presented this proposal, Memorial's administrator obtained an oral report from a certified public accountant who estimated that HPI's services would be two to three percent more expensive than those the Medicare survey team found inadequate. *Id.* at 9350. The next day the administrator presented this estimate and HPI's proposal to Memorial's board of directors, which agreed to enter into a pharmacy services contract with HPI. *Id.* at 9351. Memorial's board of directors reached that decision without information about the cost at other hospitals of the services HPI would provide. "It only had total operating costs to compare with other

hospitals." *Id.* Moreover, Memorial did not advertise or request competitive bidding. *Id.* Memorial nevertheless accepted HPI's proposal.

At the end of fiscal year 1979, Memorial requested reimbursement for that portion of HPI's charges relating to pharmacy services for Medicare patients. The Act entrusts the initial determination of the reimbursement a hospital may receive to an intermediary agency or organization appointed by the Secretary. *See* 42 U.S.C. § 1395h (1982). The Secretary appointed Blue Cross of Oklahoma ("Blue Cross"), a private insurer, as intermediary to audit Memorial's Medicare reimbursement claim for 1979. Using a cost-per-patient-per-day ("per diem") method of accounting, Blue Cross compared Memorial's total pharmacy costs and those of "peer" hospitals. All the hospitals in this peer group had between forty-six and sixty patient beds, were located in Oklahoma, and used drug-dispensation methods different from those HPI furnished Memorial's patients. For instance, not one of the peer hospitals operated an intravenous admixture program similar to Memorial's.

The intermediary found Memorial's 1979 pharmacy costs "substantially out-of-line with the hospitals in the peer group." *Memorial I* at 9351. It then decided to reduce Memorial's claimed cost figures to the highest per diem cost figures of any hospital in the peer group, and adjusted the result by an inflation factor. This calculation resulted in an approved reimbursement that was $30,000 short of Memorial's 1979 claim.

Memorial asked the Provider Reimbursement Review Board ("Board") to restore the amount Blue Cross had refused to approve. Memorial advanced three principal arguments. First, Memorial contended that Blue Cross had not properly applied Medicare regulations in 42 C.F.R. § 405.-451(c)(2) "because it did not compare [Memorial's] services with other institutions with a more similar scope of services." *Memorial I* at 9351. Second, Memorial argued that Blue Cross' accounting was

inaccurate, particularly because Memorial's pharmacy costs included overhead expenses absorbed by the pharmacy contractor, while those of the peer hospitals included only direct costs. Third, it complained that Blue Cross failed to provide written notice of its disagreement with Memorial on the "going price" for contracted pharmacy services.

The Board rejected these contentions. Although it agreed with Memorial "that there are some differences in the scope of services rendered between the provider and the providers in the peer group[, and] that the Intermediary only included direct pharmacy costs of the peer group," *id.* at 9353, the Board concluded "that these differences in scope of services and cost measurement variations are reasonably compensated for by using the highest per diem in the peer group study." *Id.*

Board member Richard A. Dudgeon dissented. He argued Blue Cross' cost comparison "is based on assumptions of comparability not established by evidence." *Id.* at 9354. Blue Cross had calculated that the total costs of pharmacy services per diem were $18.03 at Memorial and approximately $12.42 at the costliest peer group hospital, Tahlequah. None of the hospitals in the peer group, however, employed a pharmacist to prepare intravenous drug solutions. Instead they all relied on nurses to perform that task. According to member Dudgeon, that difference in services between the peer hospitals and Memorial accounted for nearly all the alleged excess in Memorial's pharmacy costs. Per diem general pharmacy costs were $10.46 at Memorial and $9.84 at Tahlequah, but intravenous admixture costs were $7.57 per diem at Memorial and $2.59 per diem at Tahlequah. "It is evident that the area of difference is [intravenous] admixture." *Id.* Dudgeon criticized the criteria applied in the selection of the peer group, suggesting it should have included larger institutions as well as hospitals in neighboring states not serviced by the same intermediary.

Memorial also applied for reimbursement of its fiscal year 1980 Medicare pharmacy costs. Blue Cross, still acting as intermedi-ary, compared Memorial's pharmacy costs with those of a peer group that included more Oklahoma hospitals than its 1979 audit, and fifteen Arkansas facilities as well. It again determined that Memorial's pharmacy costs were excessive, and approved a reimbursement $44,000 lower than Memorial's claim. *Memorial Hospital (Stillwell, [sic] Okla.) v. Blue Cross/Blue Shield Assoc./Blue Cross/Blue Shield of Oklahoma,* [1984 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 34,140 (June 21, 1984) (*"Memorial II"*). On appeal to the Board, Memorial contended that Blue Cross' 1980 audit suffered from the same shortcomings as the 1979 audit. In support of its continued attack on Blue Cross' accounting method, Memorial produced a new study that concluded Blue Cross should have used a "Patient Care Unit" ("PCU") system of pharmacy cost accounting instead of the per diem method. It also asserted, as Board member Dudgeon had in his *Memorial I* dissent, that "the real problem of comparability derives from the IV therapy and admixture program." *Id.* at 10,112.

The Board rejected these arguments and found the intermediary's "adjustment of [Memorial's] pharmacy costs was a reasonable and appropriate application of the Regulations at 405.451 and the prudent buyer principle in PRM Sec. 2103." *Id.* at 10,113. It reasoned as follows:

> The Board finds that, while there may be some differences between the services rendered by this provider and the other providers in the comparison group, the Intermediary's analysis for comparison of providers appears appropriate based on available means to measure cost differences. Also, it finds that the PCU study may measure pharmacy productivity but that there was no evidence that it has been generally accepted as a valid base for measuring costs. In addition, the PCU and nursing staff study findings are not based on actual auditable and verifiable data of the provider of [sic] the peer group institutions in the Intermediary's analyses.

*Id.* The Board therefore concluded that Memorial's fees to HPI were not reason-

able under title 42 C.F.R. § 405.451 and section 2103 of the Provider Reimbursement Manual. *Id.*

Once again member Dudgeon dissented. He maintained that "[t]he Intermediary has the burden of proof to demonstrate that the scope of services of the I.V.–Pharmacy program at Memorial are comparable with other hospitals and that the costs thereof are out-of-line[,]" and that Blue Cross had not carried that burden. *Memorial II* at 10,114.

The Secretary declined to review either of the Board's decisions as to Memorial's 1979 and 1980 pharmacy costs, which thereupon became final. Memorial filed complaints in the district court challenging both decisions. On cross motions for summary judgment, the district court presented the issue as "whether a hospital whose total costs are unexceptional is thereby entitled to reimbursement under the Medicare Act ... for the extraordinary expenses of a single costly state-of-the-art service it elects to operate." *Memorial Hospital/Adair County Health Center, Inc. v. Heckler*, 639 F.Supp. 434, 435 (D.D.C.1986) (citation omitted). Rejecting all arguments Memorial presented to the Board, the district court concluded that the Board's decisions were not "irrational," in part because

> subsidizing a hospital's elevated aspirations for one of its services by way of disproportionate reimbursements (possibly to the neglect of other services in the same hospital, and the disappointment of other hospitals competing for the same limited government funds) is at variance with the statutory purpose. *See Home Health Care, Inc. v. Heckler*, 717 F.2d 587 (D.C.Cir.1983); *Pleasantview Convalescent and Nursing Center, Inc. v. Weinberger*, 565 F.2d 99 (7th Cir.1976). The Medicare Act vests broad power in the Secretary to control costs of medical care subject to reimbursement which health care providers should not be allowed to circumvent by artful accounting at reimbursement time.

*Id.* at 439.

Memorial disagrees. It contends, first, that the district court applied the wrong standard of review. Memorial argues that the court asked only that the Board's conclusions be supported by substantial evidence, but did not also ask whether the Board considered all "relevant factors" required in section 405.451(c)(2) of the Secretary's regulations. Second, Memorial maintains that the Board's decisions are not in accordance with the Act and HHS' cost regulation. Third, it asserts that the Board's decisions improperly rely on per diem cost accounting, rather than Memorial's purportedly more accurate accounting method. Finally, Memorial argues that Blue Cross failed to give it adequate notice of its disagreement with Memorial's figures in disregard of the notice requirement in the Manual.

The Secretary responds that the proper standard of review is the "substantial evidence" standard, and that the "arbitrary and capricious" standard is practically indistinguishable. He also contends that the Board's decisions are fully in accord with statutory and regulatory provisions, and that Memorial's proposed PCU accounting system measures efficiency rather than actual costs, and in any event is not widely accepted in the hospital industry.

We reverse the district court's judgment and essentially agree with Board member Dudgeon's views as expressed in his two dissents.

## II. DISCUSSION

### A. *Standard of Review*

■ Both sides agree that the Administrative Procedure Act, 5 U.S.C. § 706 (1982) ("APA"), supplies the applicable standard of review. *See* 42 U.S.C. § 1395oo(f)(1) (1982). Moreover, the district court's decision must be reviewed without deference because the findings of fact were made by the agency.

■ Memorial argues that the court should have applied the arbitrary and capricious standard, which assertedly includes a "relevant factors test," rather than the substantial evidence standard. Brief for Appellant at 17, 17 n. 5; Reply Brief for Appellant at 4–5. In response to the Secre-

tary's vehement protest that Memorial had urged the district court to apply the substantial evidence test, Memorial explains that while Memorial's previous counsel had done so, perhaps leading the court to err, neither Memorial's present counsel nor this court should be bound by the views of previous counsel. Reply Brief for Appellant at 5. The Secretary's position is that the substantial evidence test is appropriate, and that in any event it is no more or less rigorous than the arbitrary and capricious standard: "The Secretary's determination must simply be reasonable." Brief for Appellees at 12.

We have previously discussed the general relationship between the "substantial evidence" and "arbitrary and capricious" standards, showing that they require equivalent levels of scrutiny. *Association of Data Processing Serv. Orgs., Inc. v. Board of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683–84 (D.C.Cir.1984). While the substantial evidence test concerns support in the record for the agency action under review, the arbitrary and capricious standard is a broader test subsuming the substantial evidence test but also encompassing adherence to agency precedent. *See id.* at 683. Thus the substantial evidence test is that aspect of the arbitrary and capricious test usually applied to review of agency adjudications, but its use does not connote stricter scrutiny of agency action.

Memorial has confused the substantive requirements of the cost regulation with the district court's standard of review. The regulation states that finding a hospital's costs "substantially out of line" involves comparison with hospitals that "are similar in size, scope of services, utilization, and other relevant factors." 42 C.F.R. § 405.451(c)(2) (1985). Thus this court has reviewed a Board decision under section 405.451 and found that an intermediary failed to consider "other relevant factors." *See Home Health Care, Inc. v. Heckler*, 717 F.2d 587, 592 (D.C.Cir.1983). This confusion leads to a battle of semantics without practical significance. Reaffirming the court's interpretation in *Home Health Care*, we conclude that although the Board's adherence to Medicare regulations

is reviewable under the arbitrary and capricious standard, and the sufficiency of the Board's record is reviewable under the substantial evidence standard, the two standards involve the same level of scrutiny.

### B. *Standards of Comparison*

It should be self-evident that one objective of section 405.451(c)(2) is to ensure that apples are compared with apples, and that the apples to be compared are the services provided by a particular institution. We believe it is equally self-evident that any system of cost comparison must be based on a common approach to both accounting methodology and the elements of cost that are to be taken into consideration. We address these elements individually, beginning with the last.

### 1. Cost Accounting Method

█ As a preliminary matter we reject Memorial's challenge to the intermediary's use of a per diem cost accounting method. There is nothing in the Act or the Secretary's regulations supporting Memorial's position. This court, moreover, has previously considered a challenge to a Medicare intermediary's use of per diem cost accounting. In *Saint Mary of Nazareth Hosp. Center v. Schweiker*, 718 F.2d 459 (D.C.Cir.1983), the court reversed a Board decision for failure to follow proper accounting procedures and remanded for a determination of which procedures would be proper. The problem plaguing the Board's accounting in *Saint Mary Hospital* is different from the deficiency we find here. In *Saint Mary Hospital* the Board had improperly included patients of an "ancillary care area" of a hospital in the census count of in-patients at the hospital. *Id.* at 462. That caused the cost-per-patient-per-day (per diem) for in-patient services to appear artificially low. Although the court reversed the Secretary's decision, the court's objection concerned the intermediary's failure properly to segregate costs into appropriate categories in applying the per diem method. The court did not hold that per diem cost accounting was improper, and we decline to do so here.

### 2. Comparability of Services

■ The Board denied Memorial reimbursement of actual per diem pharmacy costs that were in excess of the highest per diem pharmacy costs in the 1979 and 1980 peer hospital groups, even though none of the comparison hospitals used a pharmacist-supervised intravenous admixture program that accounted for most of Memorial's purportedly excessive costs. The Board thus interpreted the phrase "similar ... size, scope of services, utilization, and other relevant factors" to permit it to limit its comparison to the category of "pharmacy services." The Board did not consider intravenous admixture, a part of pharmacy services, a relevant category of comparison.

We reject this approach. Under the regulations at issue, intermediaries must arrive at truly comparable bases for comparison in determining whether the actual costs of a particular provider are out of line. It was incumbent on Blue Cross in this case to come up with an appropriate basis for determining whether the costs allocated to pharmacist-supervised intravenous admixture were reasonable in light of the costs incurred by other providers offering that service. This Blue Cross failed to do.

In reaching this conclusion we do not rely upon section 2103 of the Manual. Section 2103 provides little guidance for the resolution of these cases. Paragraph A of section 2103 states that "[t]he prudent and cost-conscious buyer not only refuses to pay more than the going price for an item or service, he also seeks to economize by minimizing cost." Paragraph B adds that intermediaries may "employ various means for investigating and detecting" excessive spending. "Included may be such techniques as comparing the prices paid by providers to the prices paid for similar items or services by comparable purchasers, spotchecking, and querying providers about indirect, as well as direct, discounts." Manual (J.A. Exhibit D). These statements assume "similar items or services." The issue before us, however, is precisely whether the Board compared similar services in reaching its decisions.

We find the district court's reliance on *Home Health Care* unpersuasive. In that decision the court reversed the district court's judgment that a Board determination finding a health care provider's leased car costs excessive interfered with the practice of medicine in violation of 42 U.S.C. § 1395. The court also decided that an intermediary's survey of comparable services was inadequate under 42 C.F.R. § 405.451(c)(2), in essence because "there is no indication that [the intermediary] considered any of the characteristics of [the provider's] business; it merely adopted [an American Automobile Association leased car cost] study." *Home Health Care*, 717 F.2d at 592. Rather than support the Secretary's decisions, the court's holding in *Home Health Care* indicates that the court has not hesitated in the past to scrutinize carefully an intermediary's adherence to section 405.451(c)(2).

As in *Home Health Care*, the intermediary's duty under section 405.451(c)(2) was to compare, with common sense and care, the provider's costs and those of other providers whose services were truly comparable.

### 3. Comparability of Costs

■ Memorial contends that as HPI absorbed the overhead costs associated with its pharmacy services, Memorial's total compensation to HPI could not be compared fairly with the pharmacy costs reported by the peer group hospitals because they did not take overhead into account. The Board responds that in this case it was permissible for the intermediary to rely solely on the peer group's direct costs because any "cost measurement variations are reasonably compensated for by using the highest per diem in the peer group study." *Memorial I* at 9353.

We find these explanations unacceptable. Section 405.451(c)(2) clearly requires that the costs to be compared be truly comparable; that is to say, that they be comprised of the same basic elements. The cost of any service provided by a complex institution, fairly measured, will reflect both direct costs and the overhead costs allocable

to the service; and this applies to Memorial as well as to the members of the peer group. Even though the billings from HPI to Memorial do not distinguish between direct and indirect expenses, surely it is not beyond the capacity of accounting and health care professionals to find a reasonable basis for making such an allocation.

C. *Implementing the Regulatory Requirements*

■ As Board member Dudgeon demonstrated in his dissent, the intermediary could and therefore should have divided Memorial's pharmacy costs into two parts for purposes of comparison; namely, the costs attributable to its intravenous admixture program and those attributable to the remainder of its pharmacy services. Thus, on remand, the intermediary should be required to make such a division so that Memorial's pharmacy costs may be compared with those incurred by peer groups offering comparable IV and other pharmacy services. The intermediary, in turn, should require the members of each of the peer groups, and Memorial as well, to provide information as to both the direct and overhead costs of the services in question. If it wishes to receive compensation on remand from our decision, Memorial must inform the Board of the overhead costs attributable to its IV services. Only then will it be possible for the intermediary to provide the cost comparisons contemplated by the Act and its regulations.

Because we decide the case on this basis, we do not reach Memorial's argument that Blue Cross failed to give appropriate notice of its intention to adjust Memorial's claim.

### III. CONCLUSION

As the decisions under review are based on comparisons of dissimilar health care services and dissimilar costs, we reverse the judgment of the district court and remand these cases to the district court with instructions to remand them to the Board for further action consistent with this opinion.

*So ordered.*