MERIDIAN L.P. d/b/a Hammonds Lane Center, et al., Plaintiffs,

v.

Tommy G. THOMPSON, Secretary of the United States Department of Health and Human Services, Defendant.

No. CIV.A. 02–2533(RMC).

United States District Court, District of Columbia.

Feb. 25, 2004.

Joseph L. Bianculli, Bianculli & Impink, PLC, Arlington, VA, for Plaintiffs.

Kirk L. Dobbins, U.S. Department of Health & Human Services Office of the General Counsel, Baltimore, MD, Robert E. Leidenheimer, Jr., United States Attorneys Office Civil Division, Charlotte A. Abel, United States Attorney's Office, Jill M. Abrams, U.S. Department Of Health & Human Services, Washington, DC, for Defendant.

## MEMORANDUM OPINION

COLLYER, District Judge.

Medicare and Medicaid are insurance programs that protect the elderly and infirm. The federal Department of Health and Human Services ("HHS") and delegated State agencies oversee health care providers and ensure that congressional intentions and human needs are met. The programs are immense in size and complex in operation. The associated red tape can bedevil the beneficiaries and confuse the administrators. This case presents an example of the problem.

Tommy G. Thompson, Secretary of HHS, is sued in his official capacity by four skilled nursing facilities ("SNF") that provide long-term health care to the elderly; all participate in both Medicare and Medicaid. The plaintiffs are Meridian L.P., d/b/a Hammonds Lane Center ("Hammonds Lane"); Meridian Healthcare, Inc, d/b/a Spa Creek Center ("Spa Creek"); Rose View Manor, Inc., d/b/a Rose View Center ("Rose View"); and Peninsula Regional/Genesis Eldercare, LLC, d/b/a Salisbury Center ("Salisbury").[1] The plaintiffs challenge a policy promulgated informally by former HHS Secretary Donna Shalala in September 2000. Collectively, plaintiffs seek to recover some $1.2 million in Medicare and Medicaid reimbursements that the policy denied them. Secretary Thompson rescinded the policy in the spring of 2001, but defends Secretary Shalala's policy vigorously despite its rescission. The Court does not address the questionable legitimacy of the HHS enforcement policy because the four plaintiffs failed to file timely administrative appeals and failed to establish good cause to extend the deadline for filing hearing requests. Summary judgment will be granted to the Secretary.

## BACKGROUND FACTS

A. *Statutory and Regulatory Background*

The statutes and regulations that govern the Medicare and Medicaid Programs have been described as "among the most completely impenetrable text within human experience." *Rehab. Ass'n of Va. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir.1994). Luckily, the provisions relevant here can be discussed without a translator.

The Medicare Program is a federal health insurance program for the aged and disabled under which nursing facilities, among others, are reimbursed by the federal government for the care and treatment they provide to Medicare beneficiaries. The Medicaid Program is a coopera-

---

**1.** Plaintiffs share a common corporate parent and counsel. *See* A.R. at 00002 n. 2, 00030.

tive state-federal program that provides medical assistance, including nursing facility benefits, to certain needy persons. The Centers for Medicare & Medicaid Services ("CMS") is the federal agency that administers the Medicare and Medicaid programs.[2] A participating SNF must comply with numerous Long Term Care Requirements of Participation relating to their physical plants, staffing, resident rights, clinical operations, and other requirements. *See* 42 C.F.R. §§ 483.1 *et seq.* (Medicare); *id.* at §§ 442.1 *et seq.* (Medicaid). Enforcement regulations at 42 C.F.R. §§ 488.301 *et seq.*, require a SNF to maintain "substantial compliance" with the regulations at all times. Substantial compliance entails no deficiencies that would pose the risk of causing more than minimal harm to resident health and safety. *See id.* at §§ 488.301, 488.402, 488.404, & 488.406.

HHS has the authority to audit compliance with the regulations but delegates most of that work to state survey agencies ("SSAs"). The SSAs that surveyed the plaintiffs are the Maryland Department of Health and Mental Hygiene and the Pennsylvania Department of Health. Following a survey, the SSA sends a facility a "statement of deficiencies;" it appears that 89% of all nursing facilities surveyed in 2001 were cited for one or more deficiencies. In response, the facility must file a plan of correction. Thereafter, except for cases involving the most minor deficiencies, the SSA conducts a "revisit" survey to confirm that the nursing facility actually implemented the corrective action and that it

was effective. According to the Medicare Act and regulations, the Secretary must impose a Denial of Payment for New Admissions ("DPNA") no later than three months after a deficiency is cited if the facility has not corrected all pending deficiencies before that date. *See* 42 U.S.C. § 1395i–3(h)(2)(D); 42 C.F.R. § 488.417(b)(1). Upon imposition of a DPNA, Medicare will not reimburse a healthcare provider for newly admitted patients until the DPNA is terminated. The denial of payment period ends "when the Secretary finds that the facility is in substantial compliance" with the regulations. 42 U.S.C. § 1395i–3(h)(3). The Medicaid Act contains a comparable provision. *See id.* at § 1396r(h).[3]

Because the regulations give nursing facilities three months to correct deficiencies before imposition of a DPNA, SSAs attempt to schedule their revisits within that deadline. Plaintiffs assert that prior to September 22, 2000, the Secretary permitted SSAs to conduct revisits more than three months after the initial survey and to find that a facility had resumed substantial compliance as of a date prior to the revisit. In this way, a facility could avoid a DPNA if an SSA found that it had resumed substantial compliance as of a date within the three month period. On September 22, 2000, however, Secretary Shalala issued what Plaintiffs claim was a new "revisit policy," in the form of a guidance memorandum, to the effect that HHS would no longer permit SSAs to find that a facility had resumed substantial compliance prior to the date of the actual revisit.

**2.** CMS was formerly known as the Health Care Financing Administration or HCFA. In this decision, any references in the record to the Health Care Financing Administration or HCFA have been changed to CMS.

**3.** The statutory provisions are reflected in the regulations. *See* 42 C.F.R. § 488.417(d)

("[P]ayments ... resume prospectively on the date that the facility resumes substantial compliance, as indicated by a revisit or written credible evidence acceptable to [the Secretary] (under Medicare) or the State (under Medicaid)."); *see also id.* at § 488.402(f)(4).

*See* A.R. 00351–53. According to the Plaintiffs, the Secretary also determined to apply this new policy to surveys that had been completed prior to September 22, 2000.

Neither the SSAs nor the nursing facilities were happy with the September 22 guidance memorandum. SSAs objected that HHS was imposing a burden on them to conduct revisits on short notice and the healthcare providers complained that DPNAs could be issued even when a facility had actually come into compliance before the DPNA became effective. Secretary Thompson withdrew the guidance on March 9, 2001,[4] and returned to the former policy whereby an SSA can find that a nursing facility came into compliance at a time prior to the re-visit. *See* A.R. 00378–382.

> The September 22 policy required an onsite visit to certify compliance as well as to stop sanctions. Various stakeholders contended that the policy placed further reliance on States to perform revisits timely since the date of the revisit (that verifies facility compliance) also would become the effective date of compliance as well as the date used to stop any sanctions imposed. When revisits cannot be conducted timely, facilities would continue to operate with sanctions in place. This is particularly significant when those sanctions are monetary penalties that continue to accrue until stopped as of the date of the revisit.
>
> In contrast, the revised draft policy set forth below provides requirements for certifying compliance ... [W]e have removed the expectation that revisits would generally be the only acceptable

method for verification when deficiencies involved quality of care issues.
A.R. 00378

A DPNA, like other remedies for noncompliance, can be appealed to the HHS Departmental Appeals Board ("Appeals Board"). *See* 42 C.F.R. §§ 498.1 *et seq.* A Request for Hearing must be filed within 60 days from receipt of written Notice of a DPNA, unless a facility demonstrates "good cause" for a late filing. *See id.* at §§ 498.40, 488.408(g), 498.3. The review process includes an evidentiary hearing and decision by an administrative law judge, an appeal to the appellate division of the Appeals Board, and an appeal to court. *See* 42 C.F.R. §§ 498.5, .40, .58, .60–.63, .80. Appeals of remedies other than civil monetary penalties are to the district court. *See* 42 U.S.C. § 405(g). The 60–day appeals timetable starts running from receipt of an initial Notice of a DPNA, even though the DPNA may not take effect for up to three months thereafter. *See Lopatcong Ctr. v. HCFA,* Dec. No. CR726 (2001) reported at *www. hhs.gov/dab;* CCH Medicare and Medicaid Guide ¶ 120,216. If a facility is found by an SSA to have come into compliance and the DPNA is rescinded, the administrative appeal is deemed moot and is dismissed. *See Arcadia Acres, Inc. v. HCFA,* DAB No. 1607 (1997) reported at *www. hhs.gov/dab,* CCH Medicare & Medicaid Guide ¶ 45,140. Thus, a timely appeal followed by a determination that a facility had resumed substantial compliance before the effective date of the DPNA leads to a dismissal.

### B. *Individual Plaintiffs*

The Maryland SSA completed a survey at Hammonds Lane on April 28, 2000, and

---

4. The government describes the copy of the March 9, 2000, memorandum in the Administrative Record as giving the "best evidence of its contents," although it appears to be a draft. *See* Answer ¶ 29. It was formalized by a memo issued by the Secretary dated May 3, 2001. *See* A.R. 456–461.

cited various deficiencies. On June 29, 2000, the SSA conducted its first revisit, found that one prior deficiency remained and cited new deficiencies. On July 13, 2000, the Maryland SSA sent Hammonds Lane a Notice that it would impose a DPNA on July 31, 2000. Hammonds Lane did not file an appeal by the 60th day, approximately September 17, 2000. On October 4, 2000, the Maryland SSA conducted a second revisit and on October 24, 2000, the SSA notified Hammonds Lane that it had achieved substantial compliance.[5] Pursuant to Secretary Shalala's September 22 policy, on December 5, 2000, the Secretary sent Hammonds Lane a Notice imposing a DPNA to cover the period running from July 31, 2000 through October 4, 2000. Hammonds Lane filed a Request for Hearing on April 24, 2001.

Spa Creek is located in Annapolis, Maryland, and is also surveyed by the Maryland SSA. A survey on May 4, 2000, led to citation of various deficiencies. A revisit on July 11, 2000, resulted in the citation of a single deficiency. Spa Creek submitted its plan of correction to have all deficiencies cured by July 27, 2000. On July 25, 2000, the SSA sent a Notice to Spa Creek stating that it would impose a DPNA on August 2, 2000, if Spa Creek did not achieve substantial compliance by then. Spa Creek did not request a hearing within 60 days. On October 3, 2000, SSA conducted a second revisit and found that Spa Creek resumed substantial compli-

ance.[6] Spa Creek filed a Request for Hearing on April 24, 2001.

The Pennsylvania SSA surveyed Rose View in Williamsport, PA, on May 19, 2000. On August 4, 2000, the SSA conducted a revisit survey and discovered new deficiencies and one that had not been corrected. On August 16, 2000, the Secretary (not the SSA) sent a Notice to Rose View indicating that she would impose a DPNA on September 1, 2000. Rose View did not file a request for review within 60 days. On October 24, 2000, the SSA conducted a second revisit and notified Rose View on October 31, 2000, that it had achieved substantial compliance as of September 25, 2000. Under the old policy, this meant that the DPNA would not be effective after that date. On December 7, 2000, the Secretary sent Rose View a Notice imposing a DPNA to cover the period from September 1, 2000 (prior to the date of the September 22 guidance memo) through October 24, 2000. Rose View submitted a Request for Hearing on April 24, 2001.

The fourth plaintiff, Salisbury Center of Salisbury, MD, was surveyed on September 22, 2000 and cited for deficiencies. On a revisit on November 28, 2000, the SSA found that not all of the deficiencies had been corrected. On December 4, 2000, the SSA sent a Notice to Salisbury stating that it would impose a DPNA as of December 22, 2000, if Salisbury did not correct the

---

**5.** Plaintiffs assert that the SSA notified Hammonds Lane that it had achieved substantial compliance as of July 31, 2000. The letter from the SSA, however, states only that the facility was in substantial compliance, but does not indicate the date on which this was achieved. *Compare* Pltfs.' Motion for Summ. J. at 17–18 ("Pltfs.' Motion") *with* A.R. 354–56. Nor does the letter explicitly indicate "that the DPNA would not take effect, and that the July 13 Notice was inoperative." Pltfs.' Motion at 18. However, the Secretary

does not disagree that the effect of the letter from the SSA under the pre-September 22 policy would have been no DPNA period.

**6.** The plaintiffs assert that the record is unclear as to whether the Maryland SSA found Spa Creek in compliance as of July 27, 2000, or as of October 3, 2000. They suggest that a remand will be necessary to address this point if the Court reaches the legal merits here.

deficiencies before then. Salisbury did not request an appeal or hearing within 60 days. The SSA conducted a second revisit on February 16, 2001, and on March 12, 2001, sent a notice of substantial compliance as of December 15, 2000. Later, on April 24, 2001, the Secretary sent a Notice stating that compliance had been effective as of February 14, 2001, and that a DPNA had been in effect from December 22, 2000 through that date. Salisbury submitted a Request for Hearing on April 24, 2001.

The parties agree that the pertinent revisit occurred at Hammonds Lane on the 159th day following the initial survey; at Rose View, it occurred on the 158th day; at Salisbury, it occurred on the 177th day; and at Spa Creek, it occurred on the 151st day after the initial survey. Plaintiffs contend that, with the exception of Rose View,[7] the SSA then notified the SNF that the facility had come back into substantial compliance as of the 90th day following the initial survey and that no DPNA would take effect.[8] Only *after* these returns to substantial compliance did HHS notify each facility that it was applying the new revisit policy to impose DPNAs as of the 90th day following the initial survey and through the date of the actual revisit. In each instance, the Secretary acted well beyond 60 days after the date of the initial Notice proposing a DPNA and after the relevant SSA had already found that the facility had resumed compliance.

The facilities engaged in discussions with the Maryland SSA and HHS concerning the change in policy. *See* Pltfs. Stmt.

of Undisputed Facts ¶ 69. On April 23, 2001, the Secretary refused to give any relief. *See id.* ¶ 71; Pltfs.' Motion at 23. On April 24, 2001, the next day, Plaintiffs filed a joint request for hearing with the Appeals Board and sought a finding of "good cause" for the delay in filing the request more than 60 days from the dates of the DPNA Notices. *See* A.R. 00021–42. The Secretary filed a motion to dismiss on the grounds that the requests for hearing were untimely. An HHS Administrative Law Judge agreed and dismissed the appeals on June 10, 2002. The Appellate Division issued a Final Decision on October 31, 2002, sustaining the ALJ and finding that there was not good cause to extend the deadlines to appeal the DPNAs. *See* A.R. 00017 ("Petitioners' contention that CMS's application of a policy that was consistent with the regulations was a circumstance that constituted 'good cause' for an ALJ to extend the filing deadline for a hearing request is simply not persuasive.").

It is readily apparent that when they received the notice of the imposition of a DPNA, Petitioners made conscious decisions not to request a hearing based on a series of assumptions: that the state survey agency would revisit the facility within the 60–day period to file a hearing request; that the state survey agency would then find the facility had achieved substantial compliance; that the finding of substantial compliance would then be applied retroactively to a date prior to that of the revisit; and that

---

7. In Rose View's case, the SSA found that the facility had not achieved substantial compliance until September 25, 2000, 114 days after the initial survey. Rose View concedes that it cannot recover for new admissions that occurred between September 1 and September 25, 2000 and is only challenging the DPNA imposed for the period between September 25

and October 24, 2000, the date when the revisit occurred. *See* Pltfs.' Motion at 21.

8. The administrative record is not as clear in some instances as Plaintiffs contend. The letters sent to the facilities do not explicitly state that no DPNA would take effect, but rather state that the facilities had achieved substantial compliance.

CMS would still not then impose the DPNA as of the date of the revisit that established substantial compliance....

Moreover, it is questionable how the alleged change in CMS policy might have affected the actions of three of the facilities—Hammonds Lane, Spa Creek, and Rose View—as those facilities failed to file appeals even within 60 days from receiving the further notice from CMS of the full extent of their DPNAs based on their return to compliance, thereby losing even the opportunity to argue that they had come into compliance at an earlier time. While Salisbury's April 24, 2001 request for a hearing did come within 60 days of CMS's final assessment of the DPNA, this request for review was not timely with respect to the original December 4, 2001 notice of the imposition of a DPNA. Since the only issue presented to us by Salisbury is whether there was good cause for its untimely challenge to the December 4 notification, Salisbury is in the same position as the other three facilities with regard to timeliness.

Clearly, there was nothing to prevent Petitioners from filing hearing requests as the 60–day deadline approached in order to preserve their rights to a hearing in the event the state survey agencies did not revisit and find substantial compliance within that time frame. Petitioners chose, however, not to undertake that protective course of action. As such, the ALJ was correct in concluding that Petitioners had failed to establish good cause for granting an extension to the filing deadline.

*Id.*, A.R. 00017–19 (footnote omitted).

## LEGAL STANDARDS

■ Both parties have filed motions for summary judgment. It is clear that "[j]udicial review of claims arising under the Medicare Act is available only after the Secretary renders a 'final decision' on the claim, in the same manner as is provided in 42 U.S.C. § 405(g) ...." *Heckler v. Ringer,* 466 U.S. 602, 605, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). The parties agree that the Secretary has here issued "final decisions" as to all four plaintiffs' claims. The Court has jurisdiction to hear and decide these matters.

Under the APA, 5 U.S.C. § 706(2)(A) and (E), agency action will be reversed if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or is "unsupported by substantial evidence in a case ... reviewed on the record of an agency hearing provided by statute." *Id.; see also Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–15, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Mem'l Hosp./Adair County Health Ctr., Inc. v. Bowen,* 829 F.2d 111, 116–17 (D.C.Cir.1987).

## ANALYSIS

■ The Secretary argues that only one determination is "final" and subject to Court review, *i.e.,* his decision that the plaintiffs filed untimely requests for hearing and gave no good cause to extend the deadline. *See UHI, Inc. v. Thompson,* 250 F.3d 993, 995 (6th Cir.2001) ("[P]rocedural dismissal by the Department constitutes a 'final decision' as set forth in the Medicare Act and is therefore subject to review by the Federal Courts."). He strongly resists having the Court " 'extend beyond the Board's' decision and reach the merits of the dispute." Def.'s Cross Motion for Summary Judgment at 33 ("Def.'s Motion") (*quoting Saline Cmty. Hosp. Assn'n v. Sec'y· HHS,* 744 F.2d 517, 520 (6th Cir. 1984)); *see also Bethesda Hosp. Ass'n v. Bowen,* 485 U.S. 399, 402, 108 S.Ct. 1255, 99 L.Ed.2d 460 (1988) ("We are not concerned here with the merits ... rather, we

must decide whether the Board had jurisdiction to consider the issue."); *Tucson Med. Ctr. v. Heckler,* 611 F.Supp. 823, 825 (D.D.C.1985) ("Despite the strict limits on judicial review of Medicare reimbursement decisions, plaintiffs prevail on this issue because they seek review only of the jurisdiction decision, not of the substantive claims to be argued before the PRRB."), *aff'd sub nom. Washington Hosp. Ctr. v. Bowen,* 795 F.2d 139 (D.C.Cir.1986).

### A. Hammonds Lane, Spa Creek and Rose View [9]

The plaintiffs argue that the Secretary's position would immunize Secretary Shalala's revisit policy from all review with respect to Hammonds Lane, Spa Creek and Rose View; even had plaintiffs filed "timely" requests for hearing, these three "could not have raised a challenge to the not-yet-promulgated policy." Pltfs.' Motion at 25.[10] The initial surveys of these three facilities took place before the September 22 guidance memo issued. *See* A.R. 00017 ("Petitioners assert that CMS then decided to apply this new policy retroactively to pending cases."). In each case, the revisit by the SSA that found the plaintiffs in substantial compliance occurred well beyond three months following the initial survey that had identified deficiencies; nonetheless, the SSAs had followed the former policy and recognized evidence that substantial compliance had

been achieved by the 90th day (with the exceptions noted *supra* ). Thus, the plaintiffs argue, even if they had filed timely requests for a hearing within 90 days of the Notices of DPNA, those appeals would have been dismissed as moot upon issuance of an SSA notice of substantial compliance and *before* the Secretary further notified the plaintiffs that she would retroactively apply the new policy to impose a DPNA for the period between the 90th day (following the initial survey) and the revisit that found the facility in substantial compliance.[11]

Plaintiffs' argument demonstrates that Hammonds Lane, Spa Creek, and Rose View had "good cause" for failing to file their appeals within 60 days of receiving the initial DPNA Notice. Absent other circumstances, the Court might overrule the Appeals Board on this issue and address the merits of the plaintiffs' "new policy" arguments. However, these three plaintiffs thereafter also failed to file any Requests for Hearing within 60 days of the Secretary's notice that she would retroactively impose the revisit policy. Hammonds Lane received a letter from CMS dated December 5, 2000 and did not file its request for a hearing until April 24, 2001, 140 days later. The exact timing and notices sent to Spa Creek are undetermined on this record but, at a minimum, it was notified by the Maryland SSA that it was

---

**9.** Plaintiffs attempt to draw a correlation to Salisbury, arguing that "[t]he chronology is somewhat different, but the issue is the same." Pltfs.' Motion at 4. As discussed *infra,* because the timing is critical to the outcome of this case, Salisbury will be treated separately from the other three plaintiffs.

**10.** Plaintiffs incorrectly state that the Secretary issued the guidance memo *"after* three of the pertinent four "revisit" surveys had occurred." Pltfs.' Motion at 4. All of the revisits that found the facilities in substantial compliance occurred after September 22, 2000;

namely, October 4, 2000 for Hammonds Lane, October 3, 2000 for Spa Creek, October 24, 2000 for Rose View and February 16, 2001 for Salisbury. *See* Pltfs.' Stmt. of Undisputed Facts ¶¶ 40, 48, 55, 63.

**11.** In the case of Hammonds Lane, the time frame to file an appeal of the initial DPNA Notice expired on September 17, 2000, before *the Secretary had even issued the September 22, 2000 guidance memo. See* Pltfs.' Motion at 17.

in compliance effective October 3, 2000, any letter from CMS came after that, and Spa Creek did not appeal until April 24, 2001. Rose View received a letter from CMS dated December 7, 2000, and did not file its request for hearing until April 24, 2001. The Appeals Board specifically noted the untimeliness of the requests for rehearing filed by these plaintiffs, measured from the date of the Secretary's retroactive notice. *See* A.R. at 00018 ("[T]hese facilities failed to file appeals even within 60 days from receiving the further notice from CMS of the full extent of their DPNAs based upon their return to compliance, thereby losing even the opportunity to argue that they had come into compliance at an earlier time."). The Court cannot find that this reason for dismissing Hammonds Lane, Spa Creek or Rose View was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence" and will sustain it. *Overton Park*, 401 U.S. at 413–15, 91 S.Ct. 814; *Mem'l Hosp./Adair County Health Ctr.*, 829 F.2d at 116–17.

### B. Salisbury Center

■ The facts and analysis are somewhat different for Salisbury, but the conclusion remains the same. The Maryland SSA completed its survey on September 22, 2000, the same day the Secretary promulgated the new revisit policy. The DPNA notice was issued on December 4, 2000, and the 60–day window to request a hearing therefore closed on or about February 4, 2001. *See* A.R. 00519–22. The Maryland SSA revisited the facility on February 14, 2001, and on March 12, 2001, issued a finding of substantial compliance as of December 15, 2000. Thereafter, on April 24, 2001, HHS sent Salisbury notification that is was imposing a DPNA for the period of time between December 22, 2000 and February 13, 2001. A.R. 00530. This timetable places Salisbury in a materially different position from the other plaintiffs, with which it shares a common corporate parent and counsel. The Secretary argues that because the DPNA was imposed well after the guidance memorandum issued, "[t]he facility has full knowledge of the so-called 'new policy' and more than an adequate amount of time to react accordingly. Yet, it chose to do nothing to preserve its rights." Def.'s Motion at 4. This Court agrees.

Salisbury's assertion that "neither [it] nor the SSA had any way to know until literally the day [CMS] acted—April 24, 2001—that [CMS] would apply the new policy retroactively in this particular case" is undercut by the record and is insufficient to excuse its failure to file timely an appeal from the initial Notice. A.R. 00215. On December 21, 2000, the Maryland SSA wrote to Mr. Paul D. Bach, Senior Vice President, Centers Chesapeake Region, Genesis ElderCare,[12] informing him that the SSA had "requested that [CMS] reconsider the denial of payment sanction for Hammonds Lane and Spa Creek." A.R. at 00368. The letter concluded

> We hope that [CMS] will approve our request for reconsideration but *[CMS] has made it clear that any future sanctions such as a civil monetary penalty or denial of payment for new admissions continue to be in effect until the date of the re-visit that finds the facility in compliance not the date that the facility alleges compliance.*

*Id.* (emphasis added). Moreover, as Salisbury admits, following DPNA impositions

---

12. Inasmuch as all four plaintiffs are owned by the same corporate parent and represented by the same legal counsel, the Court finds that knowledge of this letter—and the position of CMS on its revisit policy—can be imputed to Salisbury.

in December on its sister facilities, its corporate parent had "been in continual discussions with SSA and [CMS] Regional and Central Office officials regarding this matter." A.R. 00030. The Maryland SSA, Salisbury's sister facilities, and Salisbury's corporate parent were therefore well aware before the 60–day window had closed that the revisit policy set forth in the September 22 memorandum would be applied to Salisbury.

Given these well-known circumstances, as well as Salisbury's admitted uncertainty regarding the imposition of a DPNA, *see* A.R. 00215, the relevant date for a timely appeal was 60 days after December 4, 2000, the date of the initial Notice from the SSA, and not 60 days after April 24, 2001, when Salisbury received notice of the extent of the DPNA to be imposed by CMS. On or before February 4, 2000, Salisbury knew or should have known of the Secretary's new revisit policy and that the Secretary would impose a DPNA from the 90th day after the Notice until the SSA conducted a revisit. The Court cannot fault the Appeals Board for not excusing Salisbury's failure to file timely an appeal to protect its rights. "While Salisbury's April 24, 2001 request for a hearing did come within 60 days of CMS's final assessment of the DPNA, this request for review was not timely with respect to the original December 4, 200[0,] notice of the imposition of a DPNA." A.R. 00018; *see also id.* ("Clearly, there was nothing to prevent Petitioners from filing hearing requests as the 60–day deadline approached in order to preserve their rights to a hearing in the event the state survey agencies did not revisit and find substantial compliance within that time frame."). There is substantial evidence in the record as a whole to support the Appeals Board's finding that Salisbury's appeal was untimely and that Salisbury had failed to establish good cause for granting an extension to the

filing deadline. Therefore, the Appeals Board's decision to that effect was neither "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" nor "unsupported by substantial evidence." *Overton Park*, 401 U.S. at 413–15, 91 S.Ct. 814; *Mem'l Hosp./Adair County Health Ctr.*, 829 F.2d at 116–17.

### Conclusion

While the Appeals Board erred insofar as it refused to waive the deadline for three plaintiffs to file Requests for Hearing within 60 days of the initial Notices of DPNA, its conclusions that plaintiffs failed to file timely appeals and had failed to establish good cause for granting an extension to the filing deadline is supported by substantial evidence in the record as a whole. Plaintiffs' motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**. A separate Order accompanies this Memorandum Opinion.

### ORDER AND JUDGMENT

For the reasons stated in the Memorandum Opinion separately and contemporaneously issued this 25th day of February, 2003, it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED**; and it is

**FURTHER ORDERED** that Defendant's Cross–Motion for Summary Judgment is **GRANTED**; and it is

**FURTHER ORDERED** that judgment is entered in favor of Defendant and against Plaintiffs.

**SO ORDERED.**